[Civ. No. 22330.   Second Dist., Div. One.   Feb. 4, 1958.]

STANLEY C. ELSIS et al., Respondents, v. GORDON EVANS, Appellant.

John H. Nelson and Dean M. McCann for Appellant.

James M. Nicoson and Arthur Garrett for Respondents.

WHITE, P. J.—Respondent Stanley C. Elsis is business representative and a member of Office Employees International Union, Local Number 30 (hereinafter referred to as the Union). The other plaintiffs are officers and members or members of said union. They instituted this action themselves and for and in behalf of said local union and the members thereof.

Appellant Gordon Evans, under the firm name of Thrifty Telephone Answering Service, is engaged in the business of conducting a telephone answering service for his customers and clients.

By their complaint respondents alleged that on or before March 1, 1956, some of them were employed as telephone operators by appellant in the conduct of his business. That between March 1st and March 5th, 1956, certain named respondents signed written applications and became members of the aforesaid union. That such employees requested and authorized the union and its officers and agents to represent and bargain collectively for them with respect to grievances, wages, hours of employment and conditions of work, and "to engage in other concerted activities for their mutual aid and protection."

It is then alleged that about March 5, 1956, respondent Charles Henderson as a representative of the union and in behalf of the employees above mentioned, stated to appellant Evans that a majority of the latter's employees had designated said union as their exclusive collective bargaining representative and had become members of said union. That respondent Henderson then invited appellant Evans to meet with him "for the purpose of discussing working conditions, wages, hours of employment and other matters and to negotiate a contract covering such subject and others." That appellant Evans agreed to such meeting but subsequently and before the time set therefor, advised respondent Henderson that he would not meet with him "at the meeting scheduled for the following day or at any other time, and since said date, has refused and continues to refuse to meet with plaintiff Henderson or any other representative of his employees or any agent . . ." of said union concerning the aforesaid conditions of employment.

It is then alleged that appellant and his codefendants on or before February 14, 1956, conspired together to "interfere with, restrain and coerce the plaintiffs and others similarly situated, in the exercise of their rights to full freedom of association, self-organization, and designation of representatives of their own choosing and for other concerted activities for the purpose of collective bargaining and for other mutual aid and protection, and further, to require, as a condition of employment that plaintiffs and others similarly situated must refuse to join or remain members of a labor organization or that if said plaintiffs and others similarly situated were members of a labor organization, that they and each of them, as a condition *of* continuing employment, must give up their membership in such labor organization or any other labor organization."

It is then alleged that in furtherance of and in pursuance of said alleged common plan of conspiracy, appellant and his codefendants committed the following specific acts:

"(a) That on March 5, 1956 after receiving the aforementioned telephone call from Plaintiff Henderson, Defendant Evans (appellant) summons individually and separately into his private office," the foregoing named employees of appellant, "and questioned each of them separately as to whether or not they and each of them had designated the said Local No. 30, as their collective bargaining representative and whether or not they had become members of said Local No. 30. Each gave answers in the affirmative to both questions. Thereupon, defendant Evans told each of such employees that unions were a bunch of communists and racketeers and that they took their orders and directions from Russia and that any employee of his that had joined a union and who didn't withdraw from such membership would be summarily discharged and defendant Evans further stated that each of the employees whom he had questioned and who had given affirmative replies, as aforesaid, could not work for him until they withdrew their membership from said Local No. 30. That when plaintiff Lee Barnes (one of said employees) refused to withdraw her membership from said Local No. 30, defendant Evans summarily discharged her. Defendant Evans, during these questionings stated to plaintiffs Valerye De Armon, Ronald Ruff and Douglas Cameron, that they each should think the matter over and call him later in the day as to their decision of remaining in the union or remaining an employee of defendant Evans. Thereafter, and on the same day, plain-

tiffs De Armon, Ruff and Cameron, stated to defendant Evans, that they desired to remain members of said Local No. 30, whereupon defendant Evans stated to them that they had made their choice, that it was either the union or Evans and since they desired to remain members of Local No. 30, their employment was terminated.

"(b) At or about the same time and in the similar and same manner, defendant Evans gave the same information to and took the same actions against Mary Norberg and Dorothy Phillips."

.  .  .  .  .  .  .  .  .  .

"(d) Thereafter, and on or about March 7, 1956 defendant Evans met with defendants Lauria, Papke, Hanson and other members of Telephone Answering Service of California, Inc., whose names are unknown to plaintiffs but are well known to defendants and each of them and agreed to unite and combine to blacklist and prevent any of the plaintiffs herein and other members of the said Local No. 30, obtaining employment as operators in any of the business establishments of defendants and other members of Telephone Answering Service of California, Inc." It is then alleged on information and belief that after the discharge of the above-mentioned employees, appellant Evans prepared a writing wherein he listed the names of the employees he discharged, and stating therein that said employees had been discharged because of their membership in and activities in behalf of said union. That copies of said writing were delivered to members of Telephone Answering Service of California, Inc. (a nonprofit corporation composed of persons and corporations engaged in the business of telephone answering services, and which corporation was named herein as a defendant) requesting that members of Telephone Answering Service of California, Inc., should refuse to employ any of the persons mentioned in said writing, because of their membership and activities in said union.

It is then alleged that because of the foregoing conduct on the part of appellant and his codefendants, the employee respondents aforesaid have been unable "to secure employment as operators in any telephone answering service business in the City and County of Los Angeles."

The prayer was for injunctive relief against the alleged acts of appellant and his codefendants including reinstatement of the allegedly discharged employees of appellant; for damages in the sum of $200,000 and exemplary damages in the sum of $250,000.

The instant action was filed June 13, 1956, and subsequently respondents obtained an order to show cause directing appellant and his codefendants to show cause why a preliminary injunction should not be issued prohibiting appellant from interfering with the rights of self-organization of his employees; ordering appellant to recognize and bargain collectively with Office Employees International Union, Local Number 30; ordering him to reinstate certain named employees with back pay and requiring the corporate trade association (defendant Telephone Answering Service of California, Inc.) to instruct its members that their employees were free to join and become members of a labor organization.

In opposition to the issuance of a preliminary injunction appellant filed an affidavit controverting the allegations of the complaint and of the affidavits of respondents.

In his said affidavit, appellant denied the discharge of respondent employees with the exception of Lee Barnes, and with reference to her, he averred that she was employed as chief operator and was considered by appellant as "a supervisory or managerial operator and not a rank and file employee." That said employee had authority to discharge any switchboard operator, and "was in full charge of the establishment during the absence of affiant." That for some time prior to the date mentioned in the aforesaid complaint and respondents' affidavits, the work of said respondent Barnes in her supervisory capacity "had been increasingly unsatisfactory to affiant." Citing several instances which prompted appellant's dissatisfaction, he avers that he had determined to replace respondent Barnes as chief operator, and "believed that it would be unwise to demote her to a non-supervisory position, even though her services as an operator would have been satisfactory." Appellant then sets forth that he commenced negotiations during the months of January and February, 1956, with representatives of two telephone answering services in an effort to procure employment for respondent Barnes. Appellant then avers that after he had informed said respondent of his intention to discontinue her services, she "conceived the plan of interesting her fellow employees in becoming members of the plaintiff union and contacted the plaintiff union for that purpose with the hope and desire that the advent of the union would confer immunity from discharge on plaintiff Lee Barnes.

"When affiant learned that Lee Barnes had in fact contacted the plaintiff union and had induced several rank and file

employees of affiant to become members of said union, all in violation of her duties, responsibilities and loyalties as a supervisory employee, *affiant did in fact discharge plaintiff Lee Barnes immediately*. Affiant did not as alleged in the Complaint and as set forth in the affidavit of Lee Barnes, ask Lee Barnes to withdraw from the union as a condition of continued employment. On the contrary *affiant unequivocally discharged Lee Barnes* for her actions in soliciting union membership among the employees under her supervision contrary to the obligations and duties of her position.

"On July 9, 1956 affiant made a written unconditional offer of employment to plaintiff Lee Barnes." (Emphasis added.)

Appellant denied the statements in the affidavit of said respondent Lee Barnes that the former stated that it had been discussed and agreed among members of defendant Telephone Answering Services of California, Inc, that each owner-member would report to each other when employees quit or were discharged, and that each owner-member agreed not to employ such person unless the former employer assented thereto, or that appellant had entered into any such agreement. He specifically denied that he entered into any agreement or conspired with any other person or association to require as a condition of employment that any prospective employee must refuse to join or remain a member of a labor organization. Appellant denied writing any letters or engaging in telephone conversations for the purpose of employing any alleged black list or to prevent the employment of respondent employees.

Appellant further set forth in his affidavit that instead of refusing to employ certain named respondents he had, on July 9, 1956, written said respondents extending to them an unconditional offer of employment.

Appellant admitted asking respondent Valerye De Armon "to drop her membership" in respondent union, but that he did not terminate her employment. That she "went on strike" in protest against the discharge of respondent Lee Barnes. That on July 9, 1956, appellant made a written unconditional offer of employment to respondent Valerye De Armon.

Admitting that he told the last-named respondent that he "was going to require all new employees to sign an agreement that they did not belong to a union," appellant averred that he "did not in fact ever require any of his employees to make such a statement." He denied stating to respondent De Armon

"that he (appellant) would see that she didn't get employment with any other telephone answering service," but did tell her that he did not think that she would get a job at any other "answering service because it was common knowledge in the telephone answering service business that there was a strike at affiant's place of business and affiant believed it unlikely that the operators of other services would hire employees who were on strike against affiant."

As to respondent employees Douglas Cameron, Ronald Ruff, Mary Norberg, and Dorothy Phillips, appellant averred that the situation regarding termination of their employment was substantially the same as in the case of respondent De Armon. That they were not discharged but "went out on strike," and that they were subsequently offered employment.

As to the claimed agreement to meet with Charles Henderson, the union representative, appellant admitted making an agreement for such a meeting but that later in the day when he received a telephone call from Mr. Henderson protesting the discharge of respondent Lee Barnes, he (appellant) cancelled his appointment for the following day with Mr. Henderson.

In reply to appellant's affidavit, respondents Barnes, De Armon, Ruff and Cameron (all employees of appellant) filed supplemental affidavits. The substance of these affidavits was that after receipt of the letter of July 9, 1956 (referred to in appellant's foregoing affidavit) wherein it was stated appellant made an unconditional offer of employment, each of said employees promptly applied for employment. That each was told that the offer was made under duress and that appellant did not want to rehire them. Each was told there was no immediate opening for employment with appellant and to at least one appellant said he had not changed his mind about unions and that he would never have a union shop. An additional affidavit was filed by Ceola Kingsbury, Secretary-Treasurer of respondent union, wherein she averred that in a conversation with appellant concerning the discharge of the aforesaid employees, and wherein appellant admitted that he was blacklisting the union employees and that he had discharged them because of their union activities and further stated he would never employ any of the persons he had discharged on account of their union activities. Respondent asserts that none of the averments contained in these supplemental affidavits were denied, but, as pointed out by appellant, the supplemental affidavits were not filed until the date of the

hearing on the order to show cause, and therefore as he states in his brief, he "did not have an opportunity to deny the same in detail." However, the averments therein contained were in substance controverted by appellant's affidavit above set forth.

The order to show cause in re preliminary injunction came on to be heard August 18, 1956, upon the foregoing affidavits, supplements thereto, and the verified complaint. When it was developed at the hearing that charges had been filed before the National Labor Relations Board, the question of jurisdiction of the state courts arose. In that regard, the record reflects that "It is stipulated that this dispute has been submitted to the National Labor Relations Board . . ., and discussed by that Board." The record contains a letter from the Regional Director of the National Labor Relations Board, under date of April 25, 1956, wherein it is stated that the complaint to said board, "has been carefully investigated and considered. As a result of the investigation, it appears that in view of the scope of the business operation involved, it would not effectuate the purposes of the National Labor Relations Act to institute further proceedings at this time and I am, therefore, refusing to issue complaint in this matter."

Also, at the hearing in the court below, on motion of respondents, the action was dismissed as to all defendants except appellant Gordon Evans.

On August 9, 1956, the court issued its preliminary injunction prohibiting appellant from continuing certain acts and conduct toward respondents. The mandatory portions of said preliminary injunction from which appellant appeals read as follows:

"Refusing and failing to recognize and bargain collectively with OFFICE EMPLOYEES INTERNATIONAL UNION, LOCAL No. 30 as the exclusive representative of the plaintiffs herein.

"It is, hereby, further ORDERED AND DECREED that defendant, GORDON EVANS, his agents, servants, confederates, representatives, attorneys and all persons acting in concert or participation with him reinstate and employ, if they, the following named persons, so desire, Lee Barnes, Valerye De Armon, Ronald Ruff, Douglas Cameron, Mary Norberg and Dorothy Philips to the same or substantially equivalent positions as held by them at the time of their respective discharges, without loss of any rights or privileges which they then enjoyed or which have since been instituted and established

and to pay to each of them a sum of money equivalent to that which they would have earned had they not been discharged.''

As his first ground for reversal, appellant urges that the mandatory phase of the injunction is void because it grants all of the injunctive relief prayed for in the complaint. In this regard, it is contended that the general policy of the law is opposed to the granting of a preliminary injunction embodying all the relief prayed for in the complaint, before answer is filed and in advance of a trial on the merits in which witnesses can be sworn, with the right of cross-examination, so as to enable the court to see and judge what the truth may be. Illustrative of his contention, appellant cites the cases of *Griffin* v. *Lima,* 124 Cal.App.2d 697, 701 [269 P.2d 191] ; *Hagen* v. *Beth,* 118 Cal. 330, 331 [50 P. 425] ; *Gardner* v. *Stroever,* 81 Cal. 148, 151 [22 P. 483, 6 L.R.A. 90] ; *Myers* v. *Louisiana & A. Ry. Co.,* 7 F.Supp. 92, 96 ; 15 A.L.R.2d p. 247 Anno.; *Bo Kay Chan* v. *Gerdon Land Co.,* 103 Cal.App.2d 724, 726, 727, 728 [230 P.2d 1]. However, the foregoing and other cases stand for the principle that while mandatory injunctions granting all the relief prayed for, are not generally granted before the parties have full opportunity to present all the facts, nevertheless, its issuance is not condemned in extreme cases, or where proper circumstances are shown upon a proper consideration of the equities between the parties. In other words, the issuance of such a preliminary injunction is largely committed to the discretion of the court. No hard and fast rule can be adopted to fit all cases, but each must be determined upon its own peculiar facts (*Phillips* v. *Isham,* 111 Cal.App.2d 537, 539 [244 P.2d 716]). The question then arises whether the facts of the instant case justified the court in the exercise of its discretion, to require restoration of the *status quo ante* by judicial decree. We are satisfied that the answer must be in the affirmative.

We are not here concerned with litigation involving purely private rights as were the aforementioned cases relied upon by appellant, but are confronted with a situation wherein there is presented the question of whether certain respondents have been subjected to conduct on the part of appellant which it is urged is not only unfair to them, but contrary to the declared public policy of the state of California. In such a case, the courts have full power to afford necessary protection (*Williams* v. *International Brotherhood of Boilermakers,* 27 Cal.2d 586, 590 [165 P.2d 903]).

From a mere reading of Labor Code, sections 921 and 923,

there can be little if any doubt that a question of public policy is primarily involved in this litigation. In *Shafer* v. *Registered Pharmacists Union,* 16 Cal.2d 379 [106 P.2d 403], the court, after reviewing the background of the aforesaid Labor Code sections, stated, at page 385, "But there can be no doubt that the intended effect of this legislation was to balance the industrial equation, so far as it is possible to do so, by placing employer and employee on an equal basis. This purpose is plainly evidenced by section 923, which commits the state, *as a matter of public policy,* to the principles of collective bargaining. In dealing with his employer, the individual workman is said to be unable either to bargain on equal terms or to combine with his fellow workmen in order to enhance his bargaining power, hence, it is necessary that he be free to associate, organize, and to designate representatives of his own choosing. And in order to make certain that the right to associate and organize be exercised without interference by the employer, the legislature provided that if the employer, as a condition of employment, exacts a promise to join or not to join a labor union, he shall have no right to injunctive relief or damages upon a violation of that promise." (Emphasis added.)

In *Nutter* v. *City of Santa Monica,* 74 Cal.App.2d 292, 298 [168 P.2d 741], the court stated: *"In declaring the policy of the state* as found in the Labor Code sections (921, 923), the Legislature affirmed a natural right on the part of labor in private industry to enjoy freedom of contract and it outlawed the type of contract which deprives workmen of the right of free collective bargaining." (Emphasis added.)

The case of *Texas & New Orleans R. R. Co.* v. *Brotherhood of Ry. & S. S. Clerks,* 281 U.S. 548 [50 S.Ct. 427, 74 L.Ed. 1034], is authority for the statement that when an affirmative and definite declaration of public policy is contained in a legislative enactment, and such enactment definitely prohibits conduct which would thwart the declared purpose of the legislation, an intention must be assumed that the rights conferred shall be enforceable by legal proceedings. ■ We therefore, conclude that where a question of the violation of a declared public policy is involved, courts of equity are invested with power to design their decrees so as to enforce rights and compel performance of the duty prescribed therein. Where the right is present, the remedy exists. And, this may be so in the absence of penalty (*Texas & New Orleans R. R. Co.* v. *Brotherhood of Ry. & S. S. Clerks, supra,* p. 567).

In the instant case, there was evidence that appellant had deprived respondent employees of the rights of collective bargaining in violation of Labor Code, sections 921 and 923. While there were denials by appellant in part, as to the foregoing evidence, it was for the trial court to pass upon these conflicts, and when one reads the provisions of the Labor Code sections last above cited in the light of respondents' affidavits as contrasted with appellant's version of the attempted negotiations, we think it cannot justly be said that the conclusion arrived at by the court below is without substantial evidentiary support.

To us, it also seems questionable that the preliminary injunction affords *all* the relief prayed for, as contended by appellant. The complaint herein seeks damages, which in a proper case may be trebled by the judgment (Lab. Code, §§ 1050-1054). No adjudication is made in the preliminary injunction upon the issue of damages, if any, that was or is being suffered by respondent union, and no mention is made as to damages suffered or to be suffered by respondent employees. As stated by respondents, "A reasonable reading of the preliminary injunction cannot support a conclusion that the court below intended the preliminary injunction to be a final adjudication of the issues involved, nor has it done so. Under circumstances such as here a decision on the application for a preliminary injunction does not amount to a decision on the ultimate rights in the controversy and hence it was proper to issue the preliminary injunction. (*Bomberger* v. *McKelvey,* 35 Cal.2d 607, 612 [220 P.2d 729].)" Appellant insists that there were "sharp" questions of fact and "novel" questions of law. The factual question as to whether the named respondent employees "quit of their own volition or were fired by appellant," or as to "whether or not the respondent employees were all offered reinstatement," were all before the court through conflicting affidavits. The determination of the legal issues submitted were based on the law applicable thereto as succinctly set forth in *Shafer* v. *Registered Pharmacists Union, supra*; *Nutter* v. *City of Santa Monica, supra*; and *Texas & New Orleans R. R. Co.* v. *Brotherhood of R. & S. S. Clerks, supra.*

Appellant earnestly urges that the state court was without jurisdiction to issue its injunction because the National Labor Relations Board has exclusive jurisdiction over the conduct alleged in respondents' complaint. We are satisfied this contention must be sustained. As was said by

our Supreme Court in *McCarroll* v. *Los Angeles County, etc., Carpenters,* 49 Cal.2d 45, 52-53 [315 P.2d 322]: "It is now well established that if conduct may be reasonably deemed to fall within the provisions of the Labor Management Relations Act defining unfair labor practices (29 U.S.C. §§ 158(a)-(b)), a state court has no jurisdiction to grant injunctive relief under either state or federal law, even if the National Labor Relations Board has declined to exercise jurisdiction over the controversy." (Citing cases.)

Strikingly similar to the situation now confronting us, insofar as the jurisdictional question is concerned, is the case of *Guss* v. *Utah Labor Relations Board,* 353 U.S. 1 [77 S.Ct. 598, 1 L.Ed.2d 601]. In the case just cited the United States Supreme Court said: "The question presented by this appeal . . . is whether Congress, by vesting in the National Labor Relations Board jurisdiction over labor relations matters affecting interstate commerce, has completely displaced state power to deal with such matters where the Board has declined or obviously would decline to exercise its jurisdiction but has not ceded jurisdiction pursuant to the proviso to Section 10(a) of the National Labor Relations Act. (61 Stat. 146, 29 USC, § 160(a)." As to the factual background in the case just cited, it appears that appellant was doing business in Salt Lake City, Utah. He had contracts to manufacture certain equipment for the Air Force. To fulfill his government contracts he purchased materials from outside Utah in an amount "a little less than $50,000." Finished products were shipped to Air Force bases, one within Utah and the others outside. A labor union filed with the National Labor Relations Board a petition for certification of that union as the bargaining representatives of appellant's employees. A consent election was agreed to, in which it was recited that appellant was "engaged in commerce within the meaning of Section 2(6), (7) of the National Labor Relations Act." The election was won by the union which was certified by the National Board as bargaining representative. Subsequently the union filed with the National Board charges that appellant had engaged in unfair labor practices proscribed by sections 8(a) (1), (3) and (5) of the act.

As in the case now engaging our attention, the board's regional director declined to issue a complaint. He wrote as follows: "Further proceedings are not warranted, in as much as the operations of the company involved *are predomi-*

*nantely local in character, and it does not appear that it would effectuate the policies of the Act to exercise jurisdiction."* (Emphasis added.) Note the similarity of the foregoing letter with the letter of declination filed in the instant case and hereinbefore set forth.

Thereupon, the union filed substantially the same charges with the Utah Labor Relations Board pursuant to the Labor Relations Act of that state. The state board found it had jurisdiction and granted the relief prayed for through a remedial order. On a writ of review, the Utah Supreme Court affirmed the decision and order. The Supreme Court of the United States reversed the judgment, holding in unequivocal language that a state has no power to deal with matters within the jurisdiction of the National Labor Relations Board, where that board, although declining to exercise its jurisdiction, has not ceded jurisdiction pursuant to the proviso to section 10(a) of the National Labor Relations Act empowering the board to cede jurisdiction to state agencies. This proviso, added to section 10(a) of the federal act authorizes the national board to allow state agencies to take final jurisdiction of cases in the borderline industries (i.e., borderline insofar as interstate commerce is concerned), provided the state statute conforms to national policy.

In the Guss case, *supra*, the Supreme Court of the United States was confronted with the situation prevailing in the case at bar, viz., the chaotic condition that is created when that national board declines to assume jurisdiction and the state courts are prohibited from enforcing a legislatively declared public policy. In answer to the dilemma, the United States Supreme Court had this to say:

"We are told by appellee that to deny the state jurisdiction here will create a vast no-man's-land, subject to regulation by no agency or court. We are told by appellant that to grant jurisdiction would produce confusion and conflicts with federal policy. Unfortunately, both may be right. We believe, however, that Congress has expressed (353 U.S. 11) its judgment in favor of uniformity. Since Congress' power in the area of commerce among the States is plenary, its judgment must be respected whatever policy objections there may be to creation of a no-man's-land. Congress is free to change the situation at will."

The court disposes of claimed rights of state forums with this language:

"We hold that the proviso to Section 10(a) is the *exclusive*

*means* whereby States may be enabled to act concerning the matters which Congress has entrusted to the National Labor Relations Board. We find support for our holding in prior cases in this Court.'' (Emphasis added.)

That the court below relied heavily on the case of *Garmon* v. *San Diego Bldg. Trades Council,* 45 Cal.2d 657 [291 P.2d 1], is evidenced by the court's minute order granting the preliminary injunction here under attack, wherein it is stated: ''This court has jurisdiction of the cause of action'' (citing the Garmon case, *supra*). However, subsequent to the decision of the superior court therein, the Supreme Court of the United States ordered that the judgment of the California Supreme Court be ''vacated'' and the cause be remanded ''for proceedings not inconsistent with this opinion (*San Diego Bldg. Trades Council* v. *J. S. Garmon* [353 U.S. 26 (77 S.Ct. 607, 1 L.Ed.2d 618, 620)]), and the opinions in *Guss* v. *Utah Labor Relations Board, supra,* and *Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc., supra* [353 U.S. 20 (77 S.Ct. 604, 1 L.Ed. 2d 613)].'' In the Garmon case, *supra,* the United States Supreme Court said: ''Recognizing that respondents' business affected interstate commerce, it (the Supreme Court of California) concluded that the Board's *declination,* in pursuance of its announced jurisdictional policy, to handle respondents' representation petition *left the state courts free to act.*'' (Emphasis added.) The United States Supreme Court then went on to say: ''What we have said in *Guss* v. *Utah Labor Relations Board,* 353 U.S. 1 [77 S.Ct. 598, 1 L.Ed.2d 601], and *Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc.,* 353 U.S. 20 [77 S.Ct. 604, 1 L.Ed.2d 613], is applicable here, and those cases control this one in its major aspects.'' And, in the Guss case, *supra,* the United States Supreme Court definitely stated: ''We hold that the proviso to Section 10(a) is the *exclusive means* whereby States may be enabled to act concerning the matters which Congress has entrusted to the National Labor Relations Board. We find support for our holding in prior cases in this Court.'' (Emphasis added.)

We cannot refrain from saying that if we are to sustain our age-old boast that for every wrong the law provides a remedy, the situation now existing under federal labor law where interstate commerce is involved, is a sorry one. Conceding that the federal government has the right to preempt and occupy the field of labor relations insofar as unfair labor practices are concerned in interstate commerce, surely there exists no moral or legal reason why, in the event federal labor

boards decline to accept jurisdiction in a given case, the state courts should not be permitted to enforce a legislatively declared public policy, where that policy is consistent with the federal policy in the field of labor relations. To adopt a "dog in the manger" policy in these matters that "we will do nothing and you can do nothing" is unfair to both management and labor, as well as all the citizens of the respective states who are also interested in a judicial or quasi-judicial solution of problems arising in that field, which affect the welfare of the entire state. If, as the Supreme Court of the United States said in *Guss* v. *Utah Labor Relations Board*, *supra*, concerning the "vast no-man's-land" now created, "Congress is free to change the situation at will," then both management and labor can perform no greater service or higher duty than to demand that in the interests of justice and recognition of states rights, the duly constituted federal agencies shall either act, or upon their declination so to do, jurisdiction shall automatically revert to the state courts or duly constituted state labor relations boards. That Congress has placed the federal board on "short rations," thereby raising budgetary problems, which compel the declination of cases where the "industry" involved is "predominantly local in character" (*Guss* v. *Utah Labor Relations Board, supra,* 1 L.Ed.2d, p. 606) furnishes no just, moral, or legal reason for denying relief in such cases by state courts or agencies where the state law is consistent with the national labor policy and will not be thwarted even in the predominantly local enterprises to which the proviso (§ 10(a)) applies. (*Guss* v. *Utah Labor Relations Board, supra,* 1 L.Ed.2d, p. 607.)

The policy of the federal board to refuse jurisdiction in certain cases was declared by the board in its public announcement of October 6, 1950, that in order ". . . to better effectuate the purposes of the Act, and promote the prompt handling of major cases (the Board) has decided not to exercise its jurisdiction to the fullest extent possible under the Authority delegated to it by Congress, but to limit that exercise to enterprises whose operations have, or at which labor disputes would have, a pronounced impact upon the interstate flow of commerce wherever federal jurisdiction exists under the state and the interstate commerce clause of the Constitution. . . ." Among the enterprises excluded were those which did not have a "direct inflow of material valued at $500,000 a year" or an "indirect inflow of material valued at $1,000,000 a year." (26 Labor Relations Reference Manual 50.)

The declared purposes of the foregoing public announcement of the federal board, in our opinion, give force to our critical language of a system that permits adjudication of "major" cases involving unfair labor practices, but denies redress or remedy in cases where the enterprises involved do not have a "direct inflow of material valued at $500,000 a year" or an "indirect inflow of material valued at $1,000,000 a year." If good morals and law should be one and inseparable, how can such discrimination be justified under a legal system that boasts of "*equal justice for all*"? The evil could easily be eradicated and a forum be provided for adjudication of those cases which the federal board considers less than "major," by providing for concurrent jurisdiction thereof in the courts and agencies of the respective states when the declared public policy of said states in the field of labor relations is not inconsistent with and will not thwart the federal policy.

On reconsideration of the Garmon case, *supra,* the California Supreme Court decision filed January 16, 1958, (49 Cal.2d 595 [320 P.2d 473]) clearly declares that in conformity with the mandate of the United States Supreme Court, one who is injured by unfair labor practices, contrary to the declared public policy of the state, may obtain judgment for sustained damages, but is without any remedy in cases affecting interstate commerce insofar as equitable injunctive relief to stop such injurious practices is concerned, unless the federal board cede jurisdiction to the state courts. If this amounts to equal and exact justice for all, we fail to perceive it.

However, until Congress acts in the matter, we are bound by the foregoing and other decisions of the Supreme Court of the United States.

It therefore now becomes necessary to determine whether the alleged conduct of appellant may be reasonably deemed to fall within the provisions of the Labor Management Relations Act defining unfair labor practices (29 U.S.C. § 158(a)-(b)).

We entertain no doubt that the acts and conduct in which appellant is prohibited from engaging and the acts he is compelled to do by the preliminary injunction constitute acts and conduct either protected or prohibited by the National Labor Management Relations Act, *supra.*

1. Interference with employees' right to select a bargaining agent (29 U.S.C. § 158(a) (1)).

2. Discharging employees because of union activities (29 U.S.C. § 158(a) (3)).

3. Exacting "yellow. dog" contracts from employees (29 U.S.C. § 158(a) (3)).

4. Failing to recognize the employees' bargaining agent (29 U.S.C. § 158(a) (5)).

5. Reinstatement and back pay to certain employees (29 U.S.C. § 160(c)).

■ Respondents argue that the amount or quantity of interstate commerce done by appellant in his business should be considered in determining whether exclusive jurisdiction rests in the federal board. This contention would appear to have been determined adversely to respondent in the case of *National Labor Relations Board* v. *Fainblatt,* 306 U.S 601, 606 [59 S.Ct. 668, 83 L.Ed. 1014], wherein it is stated: "The power of Congress to regulate interstate commerce is plenary and extends to all such commerce *be it great or small."* (Emphasis added.) As was said in *National Labor Relations Board* v. *Mid-Co Gasoline Co.,* 183 F.2d 451, 453, "As we read the decisions which have construed the Act, we are constrained to the view that they hold that in providing machinery for the adjustment of labor disputes, the Congress fixed no standard of degree by the use of which it can be said, as a matter of power rather than of wise policy, that a particular amount of probable direct interference with interstate commerce is too little to come within its cognizance. . . . *Congress. in short, in entrusting the enforcement to the wise discretion of the Board, spoke not quantitively or fractionally or in terms of degree, but qualitatively and in comprehensive terms."* (Emphasis added.) The cases of *San Diego Bldg. Trades Council* v. *Garmon, supra; Guss* v. *Utah Labor Relations Board, supra; Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc.,* 353 U.S. 20 [77 S.Ct. 604, 1 L.Ed.2d 613], as well as *McCarroll* v. *Los Angeles County etc. Carpenters, supra,* all support the conclusion that any activity prohibited or protected by the federal board may not be enforced or protected by the state courts.

■ Since the federal board (National Labor Relations Board) has the power to take affirmative action including the right to order reinstatement of employees with or without back pay, and to otherwise effectuate the policies of the National Labor Relations Act, we are impressed that a prayer for punitive damages will not impair the exclusive jurisdiction vested in the federal board (*Swope* v. *Emerson Electric Mfg. Co.,*

(Mo.) 303 S.W.2d 35, 40; *Born* v. *Laube,* 213 F.2d 407, 409, rehearing denied 214 F.2d 349, certiorari denied 348 U.S. 855 [75 S.Ct. 80, 99 L.Ed. 674].)

The final question presented is whether it may be reasonably assumed that appellant's business activities come within the realm of interstate commerce. In that regard respondents assert that the record herein is barren of any evidence that appellant's business affects commerce within the meaning of the Federal Labor Management Relations Act. With this contention, we cannot agree. In the first place, respondents themselves recognized that appellant's activities are an integral part of the communications system throughout the United States, when they filed charges with the National Labor Relations Board requesting that said board conduct an investigation and for certification of representatives under section 9(c) of the National Labor Relations Act. The clerk's transcript shows that it was stipulated "that this dispute has been submitted to the National Labor Relations Board . . . and counsel agree to furnish this court with copies of the Board's orders of dismissal in those cases." When the court was furnished with the requested copies of the national board's dismissal orders, the preliminary injunction was issued on the authority of the California Supreme Court decision in *Garmon* v. *San Diego Bldg. Trades Council,* 45 Cal.2d 657 [291 P.2d 1], wherein it was held that (p. 663), "By giving the board discretion to accept or refuse jurisdiction, the legislative purpose must have been to give the state courts jurisdiction when the board specifically determines that the controversy will not affect the national economy." After issuance of the preliminary injunction herein the California Supreme Court decision was vacated, and the authority upon which the court below acted herein was set aside. The petition to the federal board was not dismissed for lack of jurisdiction but only because the "scope of the business operations involved, would not effectuate the purposes of the National Labor Relations Act." As heretofore pointed out, such a declination does not invest the state courts with jurisdiction if the controversy falls within the provisions of the federal act.

In *Bloemer* v. *Ezell,* 112 F.Supp. 814, it was held that operators of secretarial service consisting of receiving and transmitting telephone messages, some of which were in interstate commerce, were within the purview and coverage of the federal Fair Labor Standards Act of 1938. Coverage under

the Fair Labor Standards Act is dependent upon the enterprise affected being "engaged in commerce," which we regard as synonymous with "affect commerce," the requisite test under the National Labor Relations Act with which we are here concerned (see also *Tobin* v. *Lambert*, 22 C.C.H. Labor Cases, par. 67129; *Mitchell* v. *Bearden*, 32 C.C.H. Labor Cases, par. 70538).

We are persuaded that appellant's activities in a telephone answering service receiving interstate as well as intrastate communications must be held to affect interstate commerce. To hold otherwise would require the courts to shut their eyes and ears to everyday happenings of contemporary life. This they cannot and should not do. Such a telephone answering service as here involved manifestly must be regarded as an integral part of the communications system operating throughout the United States. In *Guss* v. *Utah Labor Relations Board*, 353 U.S. 1, 3, 10; 1 L.Ed.2d, *supra*, page 603, the Supreme Court said that by the use of the language "affecting commerce" in the Labor Management Relations Act, Congress meant to "reach the full extent of its power under the commerce clause," and that this was so notwithstanding a "no-man's-land" is created when the National Labor Relations Board refuses to exercise jurisdiction and state courts are precluded from acting. In *National Labor Relations Board* v. *Denver Bldg. & Construction Trades Council*, 341 U.S. 675, 684, 685 [71 S.Ct. 943, 95 L.Ed. 1284], it was held that if the effect on commerce is more than *de minimis*, it is covered by the federal act.

The court being without jurisdiction to grant the injunctive relief prayed for, it becomes unnecessary to discuss or decide other contentions advanced on this appeal.

For the foregoing reasons, the order granting a preliminary injunction is reversed.

Fourt, J., and Drapeau, J.,* concurred.

Respondents' petition for a hearing by the Supreme Court was denied April 2, 1958. Carter, J., was of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.