John H. LINDSAY, John P. Schultz and Allan Herbst, co-partners, doing business as Schultz and Lindsay Gravel Co., Plaintiff and Appellant,

v.

TEAMSTERS UNION, LOCAL NO. 74, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, affiliated with the AFL–CIO, et al., Defendants and Respondents.

No. 7802.

Supreme Court of North Dakota.

July 8, 1959.

688

Bjella, Jestrab & Neff, Williston, Rausch & Chapman, Bismarck, on briefs, for appellant.

Walter O. Burk, Williston, and W. A. Jacobsen, Watford City, for respondents.

TEIGEN, Judge.

The plaintiff, co-partners, doing business as Schultz & Lindsay Gravel Company, commenced this action to invoke the injunctive powers of the state courts, alleging that the defendants were engaging in certain unfair labor practices in that the defendants were committing unlawful acts in an effort to prevent the plaintiff, by physical force and violence, from conducting its lawful business and further alleging that such force and violence will continue, resulting in the plaintiff's inability to perform its contractual obligation to its loss and detriment. The moving papers were supported by various affidavits and upon presentation the district court issued an order to show cause, in the nature of a restraining order, ex parte, which instrument directed the defendants to show cause why the restraining order should not continue in effect during the pendency of the action. Thereafter a hearing was had, evidence taken and the district court dissolved the restraining order and refused to grant a temporary injunction. (The court in its order makes reference to the instrument as a permanent injunction. However, the effect was to refuse to issue its temporary injunction.)

An appeal was taken from the order dissolving the temporary restraining order and the refusal to grant a temporary injunction during the pendency of the action.

Two actions were commenced, one five days subsequent to the first. However, both actions involved the same parties, the identical facts and with identical procedure followed, and the only reason for the second action was because of a delay of the hearing of the order to show cause occasioned by the necessity for the Supreme Court to appoint a district judge as a result of the filing of an affidavit of prejudice against the judge sitting, thus increasing the time before hearing could be had beyond the expiration of the five days provided for by Section 34–0808, NDRC 1943, making the temporary order void. Both actions by stipulation were consolidated for the purpose of the trial.

The plaintiff, a co-partnership, is engaged in highway construction and repair and at the time in question was in the act of performing a contract with the State of North Dakota for the construction, reconstruction and repair of a public highway, designated as North Dakota No. 23, lying east of Watford City, North Dakota. The defendant Union had no contract with the plaintiff. However, some of the plaintiff's employees were members of the defendant Union. The business agent of the defendant Union made demand upon the plaintiff for an increase in pay and for a contract with the Union. Both were denied by the plaintiff whereupon the employees who were members of the Union went on strike and a picket line was formed on Highway No. 23, and on an approach road thereto that led from the plaintiff's gravel pit from which pit the plaintiff was engaged in hauling gravel onto said highway using the approach road mentioned to enter the said highway with its trucks. The plaintiff operated approximately 40 large trucks for the purpose of hauling gravel onto said highway.

The employees who were non-members of the Union continued to work after the picket line was formed and it is the claim of the plaintiff that the defendants did not carry on peaceful picketing but were guilty of violence and unlawful conduct and alleged facts fully in its complaint and accompanying affidavits, constituting the moving papers.

The district court, after a full hearing, dissolved the temporary restraining order and refused to issue a temporary injunction to be effective during the pendency of the action, and in his opinion stated the controversy was a matter exclusively within the jurisdiction of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and further, that the plaintiff failed to prove that the peace officers charged with the duty of protecting the plaintiff's property are unable or unwilling to furnish adequate protection.

■ The first question to be decided is whether the plaintiff, as the employer, was subject to the National Labor Relations Act.

Highway No. 23 is a state highway, connecting, however, at the North Dakota-Montana state line with a Montana Highway and connecting on the east with U. S. Highway No. 83 which runs from Canada, where it joins the Canadian highway, to the South Dakota line, where it continues in the State of South Dakota. It is a Federal Interstate Highway. It appears that there is Federal participation in the construction job involved in this action. The Federal Government pays 66⅔ of the cost thereof and one-third thereof is paid by the state of which 22⅖ percent may be borrowed from the Federal Government. The plaintiff's contract also provides that it oil surface that part of Highway 23 upon which it was working at the time in question. The oil to be used for this purpose will be shipped into the State of North Dakota from the State of Montana. The plaintiff, being a contracting and construction

firm, on another project is engaged in building of a bridge crossing the Red River between the states of North Dakota and Minnesota, and that on another project it obtains gravel from within the State of Minnesota which is hauled onto the project site in the State of North Dakota.

The appellant is the owner of 25 of the trucks, 2 crushers and other equipment used on the project. The project was in charge of a foreman who took orders from the partners. The project was a single unit of various units operated by the partnership. The partnership is engaged in interstate commerce.

29 U.S.C.A. § 141, provides that it is the purpose and policy of the Act in order to promote the full flow of commerce, to prescribe the legitimate rights of both the employees and employers in their relations affecting commerce, to provide orderly and peaceful procedure for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and prescribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.

Section 152(6) states:

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country."

Section 152(7), "The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

A public utility which was engaged in operating a number of local telephone exchanges in the State of Missouri, and which affected the transmission of interstate messages by connecting its lines to those of an interstate carrier, was subject to the jurisdiction of the board as an instrumentality of "Interstate Commerce," notwithstanding that only a small part of its activities were connected with interstate commerce and irrespective of whether any such interstate communications were of a business nature. See N. L. R. B. v. Central Missouri Telephone Co., 8 Cir., 1940, 115 F.2d 563.

Employees who were operators of telephone answering service, transmitting telephone messages and receiving interstate as well as intrastate communications, were engaged in a business which affected interstate commerce within meaning of the chapter. See Elsis v. Evans, 157 Cal.App. 2d 399, 321 P.2d 514.

N. L. R. B. v. Reed, 9 Cir., 1953, 206 F.2d 184, held that although construction of a building is by its nature a local activity, importation from another state of a substantial amount of materials used in it affects commerce sufficiently to create jurisdiction in the Board.

In the case of N. L. R. B. v. Pierce Brothers, 9 Cir., 206 F.2d 569, it was held that legislative history of chapter does not support claim that Congress intended to exclude mortuaries from the sweep of this chapter.

In the case of N. L. R. B. v. White Swan Co., 4 Cir., 118 F.2d 1002, in which certiorari was denied in 314 U.S. 648, 62 S.Ct. 93, 86 L.Ed. 520, held that a local

laundry and dry cleaning business which was located in a city on a state line, and which was not engaged in interstate commerce except insofar as it might collect articles to be serviced and might make deliveries to customers living across the state line, was engaged in "commerce" so as to be subject to the chapter and, an unfair labor practice on its part constituted an unfair labor practice, "affecting commerce" within the chapter.

In the case of Butler Brothers v. National Labor Relations Board, 7 Cir., 134 F.2d 981, and certiorari denied in 64 S.Ct. 203, 204 (two cases), 320 U.S. 789, 88 L.Ed. 475, held that elevator operators, watchmen, and janitors employed in building owned by corporation and housing tenants engaged in interstate commerce are so closely associated with the flow of "interstate commerce" as to be entitled to protection of the chapter, regardless of whether they were employed by owner or by a building maintenance company doing work for the owner.

In Hehl v. Chippewa & Red Cedar Val. Carpenters' District Council of U. B. of C. & J. of A., 4 Wis.2d 629, 91 N.W.2d 226, the Supreme Court of Wisconsin held that employer who was engaged in construction work in state, bought and received materials which orginated outside of the state, continued picketing of employer by Union would affect employers' desire and ability to buy and would affect suppliers and other contractors, and therefore, the picketing would have some effect on interstate commerce within the chapter, and in Arizona, in the case of United Ass'n of Journeymen and Apprentices of Plumbing and Pipefitting Industry of U. S. and Canada Local No. 469, and Local No. 741 v. Marchese, 81 Ariz. 162, 302 P.2d 930, and 82 Ariz. 30, 307 P.2d 1038, held that what affects building industry in any community affects interstate commerce within meaning of the chapter, though unfair labor practice and work stoppage in a particular instance may not have immediately perceptible effect on

flow of whole stream of commerce, as many small stoppages will have such effect.

The purpose of establishing and building highways is to facilitate the movement of traffic carrying both persons and goods on the highway. Although this is a state highway, it is connected with highways in other states and some of the material used thereon would be shipped from other states, and the plaintiff being engaged in other projects involving interstate commerce, it appears to this court, based on the holdings as set forth in the case law cited and Virginia Electric & Power Co. v. National Labor Relations Board, 4 Cir., 115 F.2d 414; National Labor Relations Board v. Weyerhaeuser Timber Co., 9 Cir., 132 F.2d 234; National Labor Relations Board v. Drummond, 6 Cir., 210 F.2d 828, that it is proper to hold that the N. L. R. B. has jurisdiction and that the project and the plaintiff are subject to the Labor Relations Act.

■ The next question is whether or not a labor dispute as defined by the state and Federal law is involved in the case at bar. Section 34–0801(1) of the 1957 Supp. to NDRC 1943, states:

> " 'Labor dispute' shall include any controversy concerning terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment whether or not the disputants stand in the proximate relationship of employer and employee."

This is practically the same language as used in the Federal Act, 61 U.S. Statutes, Section 2(9), page 138; Title 29, U.S.C.A. § 152(9).

■ The evidence shows that the plaintiff was not paying union scale wages, nor maintaining union conditions of employment. Only a few of the plaintiff's employees at the time involved were members

of the Union. A demand was made by the defendant Union's representative for an increase in wages, the establishment of other than belt time and for the negotiation of a contract. This demand was rejected by the plaintiff. Immediately thereafter the Union member employees of the plaintiff went on strike and set up the picket line mentioned. We hold, therefore, a labor dispute existed. Minor v. Building & Construction Trades Council, N.D., 75 N.W.2d 139.

The defendant, Sylvan Hubrig, is a business representative or agent of the defendant Union. The plaintiff had no contract with any union although some of its employees on the job in question were members of the defendant Union. The defendant, Hubrig, had several meetings with the employees of the plaintiff which resulted in an oral demand being made by the representative upon the plaintiff for a union contract but negotiations were not entered into and no contract agreed upon. Thereafter, and on the following morning the strike was called under the supervision of the said Hubrig, Mr. Hubrig met with the strikers, being the union members employed by the plaintiff, the evening before the strike and testified he instructed them that there should only be peaceful picketing. He wanted the boys to act like gentlemen on the picket line. There was to be no violence, and no arguments. About seventeen men took part in the strike who acted as pickets. The pickets aligned themselves at a point where an approach road from the gravel pit being operated by the plaintiff intersected the said state highway No. 23. The trucks were loaded in the pit, driven out of the pit, then onto the approach road where a turn was made onto Highway No. 23. The pickets aligned themselves at this point on Highway 23 and along the said approach road. The picketing continued for three days and until the District Court issued the temporary restraining order.

The evidence is replete with incidents that occurred. The non-union employees did not participate in the strike but worked. The operation was cut down to about one-half capacity. The pickets used foul and obscene language and called the company drivers obscene names, too obscene to place in this record, when they drove out loaded or returned empty over the approach road. The pickets formed a human line in front of trucks as they approached the intersection with loads, on occasions forcing the truck driver to stop. The pickets on one occasion threw dirt at one of the drivers. Threats were hurled at drivers using their own trucks, threats to destroy the truck or destroy the tires. The pickets carried strike signs which they sometimes held up in front of the approaching trucks and in some instances placed the sign over the windshield upon the truck obstructing the driver's view. Employees driving to and from work were stopped. On occasion the car door was jerked open by a picket resulting in glass being broken. On another a windshield on an operating truck was cracked. Some of the working employees testified they were scared. Such intimidation continued off the job in town where some of the truckers went after work. The evidence discloses the actual vulgar language and threats spoken by the picketers. This evidence strongly indicates it was not peaceful picketing being carried on, but an analysis of the testimony reflects that all this took place before the sheriff was advised or called. The sheriff was not called until four or five o'clock p.m. of the first day of the strike, July 15. It was then nearly quitting time on the project. It appears the sheriff did not go out that day. The next morning, however, he went to the project before work commenced and remained there until he was relieved by a deputy sheriff about 9:30 or 10:00 o'clock a.m. The sheriff returned to the site about 1:00 p.m. that day and stayed most of the afternoon. The following morning, July 17th, he went out to the site at about 7:00 a.m. and remained there for about two hours. He then returned to the site about noon and remained for a period of about fifteen minutes. He testified he came in

response to a telephone call that there was trouble. He found that one of the pickets had taken his own truck and had driven upon the approach road in such a manner as to cut ruts or grooves into the approach road. He attempted to arrest the picket driver of the truck but he resisted whereupon the sheriff returned to the city and came back with additional deputies and took the picket into custody without resistance on the part of the picket. The sheriff did not return to the job site that day and he testified that it was not necessary the following day because the restraining order had been served. The sheriff testified that he kept two deputy sheriffs on the scene in alternating pairs commencing Wednesday morning, July 16th, the second day of the strike, and until the restraining order was served at the end of the third day of the strike. Only one of the deputies was called as a witness. He testified to no violence, except for the truck incident referred to above.

It appears the violence upon which the plaintiff relies took place before the sheriff was advised, and after the sheriff, together with his deputies, came upon the scene the picketing was peaceful except for the incident reported which was controlled by the sheriff.

On the evidence the trial court found that in its opinion the plaintiff failed to prove that the sheriff of McKenzie County was either unwilling or unable to furnish adequate protection. We are constrained to agree with the trial court.

It appears that all of the elements of Section 34–0807, NDRC 1943, were not proved in that there was a failure to establish by evidence, Sub-Section 5 of Section 34–0807, NDRC 1943, which states:

"The peace officers charged with the duty of protecting complainants property are unable or unwilling to furnish adequate protection."

The appellant urges that the acts of the defendants were in violation of Section 34–0104, NDRC 1943, making it a misdemeanor to use force, threats, or intimidation against laborers. Also that their acts were in violation of Section 34–0105, ND RC 1943, making it a misdemeanor to use force, threats or intimidation to prevent another from employing any person, and in violation of Section 34–0106, NDRC 1943, making it a misdemeanor for one to maliciously interfere with or hinder, in any way, any citizen from obtaining or enjoying employment already obtained but chose as their procedure to obtain relief under Section 34–0807, NDRC 1943, providing for an injunction by special statute in this class of cases.

■■ The granting of a temporary restraining order and a temporary or final injunction, when authorized, is a matter resting largely within the sound discretion of the trial court and its judgment will not be disturbed except in case of a clear abuse of such discretion. McCann v. Mortgage Bank & Inv. Co., 3 N.D. 172, 54 N.W. 1026; State ex rel. Security Bank of Knox v. Buttz, 21 N.D. 540, 131 N.W. 241; Beiseker v. Svendsgaard, 28 N.D. 366, 149 N.W. 352; Lee v. Jordan, 50 N.D. 365, 195 N.W. 660. The District Judge may modify, continue or dissolve an injunction or refuse to do so as well as grant or refuse to grant the injunction in the first instance. His action will not be disturbed unless it appears there was an abuse of discretion. Larson v. Jacobson, 54 N.D. 69, 208 N.W. 833; Mevorah v. Goodman, N.D., 65 N.W.2d 278.

■ The plaintiff as appellant, had the burden of showing error and establishing affirmatively that the trial court abused its discretion. First National Bank of Crary v. Bremseth, 60 N.D. 401, 234 N.W. 758; Mevorah v. Goodman, supra. The record has been reviewed and this court finds that the plaintiff appellant failed to sustain the burden of proof.

■ The main case has not been tried. The right to enjoin acts of violence by

strikers and union as provided by Chapter 34–08, NDRC 1943, and amendments thereto, is not pre-empted by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. See cases collected in 36 A.L.R.2d 1037; Youngdahl v. Rainfair Inc., 226 Ark. 80, 288 S.W.2d 589, 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151; Minor v. Building & Construction Trades Council, N.D., 75 N.W. 2d 139.

 The defendants in presenting their case called the plaintiff, Allan Herbst, one of the co-partners of the plaintiff partnership as an adverse party for examination under Rule 43(b) NDRCP and conducted the interrogation by leading questions. The attorney for the plaintiff then attempted to cross-examine the witness but was prevented from so doing by the court on its own motion. This is now alleged as error. Rule 43(b) NDRCP being the North Dakota Rules of Civil Procedure which became effective July 1, 1957, provides as follows:

"(b) Scope of Examination and Cross-Examination. A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, superintendent or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, *and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief."* (Emphasis supplied.)

As the rule now stands, the cross-examination of an adverse party by his own counsel is governed by the foregoing rule.

 Rule 43(b) liberalizes the old practice of calling an adverse party for cross-examination. When the adverse party is called, the party calling him may ask him leading questions and may contradict him and impeach him on material matters as fully as if the witness had originally been called by his own counsel. The party calling the adversary is not bound by the testimony of such a witness. When the party calling an adversary is finished with him the witness may be cross-examined by his own side but such cross-examination is limited to the subject matter of his examination in chief, and he may be contradicted and impeached by his own side. Vol. 2 Barron and Holtzoff—Federal Practice and Procedure—Rules Edition, § 966, page 689 Wright's Minnesota Rules, § 2, page 261.

We fail to see, however, that the action of the court constitutes reversible error. The counsel for the plaintiff did call this party as a witness on rebuttal and no claim is made that the plaintiff was not in its examination of him on rebuttal permitted to examine fully on matters covered in the examination of him in chief as an adverse party and in the absence of a showing that the plaintiff was harmed by the failure of the court to permit the cross-examination as provided by the rule, we are of the opinion that the court's ruling was without prejudice to the plaintiff and does not constitute reversible error. Podol v. Jacobs, 65 Ariz. 50, 173 P.2d 758.

The order appealed from is affirmed.

SATHRE, C. J., and BURKE and MORRIS, JJ., concur.