[L. A. No. 25143. In Bank. Jan. 26, 1960.]

PETRI CLEANERS, INC. (a Corporation), Respondent, v. AUTOMOTIVE EMPLOYEES, LAUNDRY DRIVERS AND HELPERS LOCAL NUMBER 88, Appellant.

Stevenson & Hackler, Stevenson, Hackler & Ansell and Herbert M. Ansell for Appellant.

Rutan, Lindsay, Dahl, Smedegaard, Howell & Tucker, Milford W. Dahl, W. W. McCray, Severson, Zang, Werson, Berke & Larson and Nathan R. Berke for Respondent.

Bronson, Bronson & McKinnon and Charles A. Rummel as Amici Curiae on behalf of Respondent.

TRAYNOR, J.—Defendant Automotive Employees, Laundry Drivers and Helpers Local Number 88 (hereinafter referred to as defendant) appeals from two orders of the trial court. One granted plaintiff's motion under the Jurisdictional Strike Act (Lab. Code, §§ 1115-1120, 1122) for a preliminary injunction against defendant's strike for recognition; the other denied defendant's motion for a preliminary injunction to compel plaintiff to bargain with defendant instead of the Independent Association of Petri Employees (hereinafter called the Association), an alleged company union.

Since plaintiff is not engaged in interstate commerce, the Labor Management Relations Act (29 U.S.C. §§ 141-197 (1947)) is not applicable. The governing statute is the Jurisdictional Strike Act. Plaintiff contends that there is a labor dispute between defendant and the Association as to which organization shall be the exclusive bargaining agent of plaintiff's employees and defendant's picketing therefore violates the act. Defendant contends that there has been no violation on the ground that the Association is not a labor organization within the meaning of the act.

This issue has not become moot by the passage of time. Although plaintiff urges that if the matter had proceeded to trial on the permanent injunction, facts relating to the formation of the Association would have been irrelevant because of the one-year limitation in section 1117, that limitation is measured from the date "of the commencement of any proceeding brought under this chapter." An action is commenced when the complaint is filed. (Code Civ. Proc., § 350.) Plaintiff filed its complaint on January 14, 1958, and all the facts bearing on the issue of the Association's independence took place from June 1957 to January 1958.

Section 1117 of the Labor Code provides in part:

"As used herein, 'labor organization' means any organization or any agency or employee representation committee or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours

of employment or conditions of work, which labor organization is not found to be or to have been financed in whole or in part, interfered with, dominated or controlled by the employer or any employer association within one year of the commencement of any proceeding brought under this chapter. The plaintiff shall have the affirmative of the issue with respect to establishing the existence of a 'labor organization' as defined herein.''

Section 1115 provides that a jurisdictional strike is unlawful and section 1118 defines such a strike as

''. . . a concerted refusal to perform work for an employer or any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to have its members perform work for an employer.''

If the Association was ''interfered with, dominated or controlled''[1] by plaintiff, it is not a ''labor organization'' within the meaning of section 1117 and there has been no jurisdictional strike within the meaning of section 1118. The determination of this issue is crucial to defendant's appeal from the order granting a preliminary injunction against defendant's strike. In deciding that issue we must first interpret the terms ''interfered with, dominated or controlled'' and then in the light of our interpretation determine whether plaintiff sustained its burden of proving that the Association is a labor organization.

Federal decisions construing section 8 (a) (1) and (2) of the Labor Management Relations Act[2] are persuasive in interpreting section 1117, for the language and policy of the two acts are similar. (See *In re Porterfield,* 28 Cal.2d 91,

---

[1] Since defendant does not attack the trial court's finding that the Association was not ''financed in whole or in part'' by plaintiff, we have no occasion to consider that part of section 1117.

[2] ''It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title;
 (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial support to it. . . .''

119 [168 P.2d 706, 167 A.L.R. 675]; *Nutter* v. *City of Santa Monica,* 74 Cal.App.2d 292, 298 [168 P.2d 741].) The federal cases have singled out typical activities condemned by the federal act. Findings that an employer dominated an inside union are usually based on obvious employer intrusion such as statements by the employer to employees on company time and property that he will not recognize an outside union but will deal with an inside association, discharging employees who solicit members for the outside union, openly leading the drive for an inside association by supplying literature and lists of the employees' names and addresses, permitting organizational meetings on company property, and directly soliciting members for the inside association. (E.g., *National Labor Relations Board* v. *Bradford Dyeing Assn.,* 310 U.S. 318 [60 S.Ct. 918, 84 L.Ed. 1226]; see note, *Employer-Dominated Unions— Illusory Self-Organization,* 40 Columb.L.Rev. 278, 283-290.)

Activities that constitute interference include manifestations by the employer that he favors one union over the other (*International Assn. of M. T. D. M. L.* v. *National Labor Relations Board,* 311 U.S. 72, 78 [61 S.Ct. 83, 85 L.Ed. 50] [Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure.]; *National Labor Relations Board* v. *Link-Belt Co.,* 311 U.S. 584, 600 [61 S.Ct. 358, 85 L.Ed. 368] [Intimations of an employer's preference, though subtle, may be as potent as outright threats of discharge.]); interrogation of employees as to their union sympathies, especially when coupled with threats of discharge for supporting the outside union or promises of economic benefits for remaining loyal to the company (*Top Mode Manufacturing Co.,* 97 N.L.R.B. 1273, 1290-1292, affirmed, *National Labor Relations Board* v. *Epstein,* 203 F.2d 482 [cert. den., 347 U.S. 912 [74 S.Ct. 474, 98 L.Ed. 1068]]; *Joy Silk Mills* v. *National Labor Relations Board,* 185 F.2d 732, 740 [87 App. D.C. 360] [cert. den., 341 U.S. 914 [71 S.Ct. 734, 95 L.Ed. 1350]]; solicitation by management of union withdrawal letters (*Texarkana Bus. Co.* v. *National Labor Relations Board,* 119 F.2d 480, 483; *National Labor Relations Board* v. *United Biscuit Co.,* 208 F.2d 52, 55 [cert. den., 347 U.S. 934 [74 S.Ct. 629, 98 L.Ed. 1085]]); unequal advantages conferred upon the inside union that are denied to the outside union, such as use of company time and property (*National Labor Relations Board* v. *Wemyss,* 212 F.2d 465, 471; *National Labor Relations*

*Board* v. *Summers Fertilizer Co.,* 251 F.2d 514, 518); and hasty recognition of the inside union, as contrasted with marked reluctance to recognize the outside union (*National Labor Relations Board* v. *Clark,* 176 F.2d 341, 342). Moreover, when an inside union is formed behind picket lines close scrutiny of its genesis is required. (*National Labor Relations Board* v. *Brown Paper Mill Co.,* 108 F.2d 867, 871 [cert. den., 310 U.S. 651 [60 S.Ct. 1104, 84 L.Ed. 1416]]; *National Labor Relations Board* v. *Summers Fertilizer Co., supra,* at 518.[3]) The Fourth Circuit, finding employer domination even though the employees signed an affidavit stating that their choice was not coerced, pointed out that ''[s]eldom does the domination and interference with employee representation which the Act prohibits take the form of threats or coercion. More often it is to be found in the guise of friendly cooperation; . . .'' (*American Enka Corp.* v. *National Labor Relations Board,* 119 F.2d 60, 62.) Virtually all of these condemned activities occurred in the present case. The trial court's finding that the Association was not interfered with, dominated or controlled by plaintiff can only be attributed to its failure to appreciate the legal significance of plaintiff's conduct. (See *Estate of Madison,* 26 Cal.2d 453, 456 [159 P.2d 630]; *Sapp* v. *Barenfeld,* 34 Cal.2d 515, 518 [212 P.2d 233]; *Pacific Pipeline Const. Co.* v. *State Board of Equalization,* 49 Cal.2d 729, 735-736 [321 P.2d 729]; *McNeil* v. *Board of Retirement,* 51 Cal.2d 278, 284-285 [332 P.2d 281].)

The undisputed evidence establishes plaintiff's background of hostility to any A.F.L.-C.I.O. union. Jeffrey Winfrey, who once served as plaintiff's route supervisor, testified that he personally aided in installing a tape recorder in the drivers' locker room to discover the men's response to a union organizational drive in 1952, and that Otto Petri, plaintiff's president, instructed him not to hire any union men. Plaintiff has operated as a nonunion shop since approximately 1950. It concedes that Otto Petri is opposed to bargaining with any A.F.L.-C.I.O. union and that his opposition is well known to the employees. Of these, ten were route drivers and twenty-

---

[3]The court's language is appropriate to this case: ''It cannot be denied that employees have a right to choose either an independent unaffiliated union composed solely of fellow employees or a union affiliated with a national or international organization, but where such choice occurs after the initiation of organizational drives by other unions and after the demand for recognition by one of these unions, any form of benefit contributed by the employer to a particular union must be closely examined.''

one worked inside the plant at cleaning, pressing, and dyeing machines. During June and July of 1957 defendant attempted to organize plaintiff's drivers, but not the inside employees. Nine of the drivers signed authorization cards with defendant.

Plaintiff knew of defendant's activities, and during the first week in July, Otto Petri questioned Archie Fraser, one of the drivers, as to his union sympathies. Fraser, a witness for plaintiff, testified that Petri indicated that ". . . he did not want to have anything to do with any union and as far as in his present mind, he was not going to sign a contract with any union or international union and that if I had taken the union as my choice why then I would have to go or just, either take the union or stay with him, have either choice.'' Owing to its coercive effect, such interrogation, coupled with a direct threat of discharge as a result of union membership, plainly constitutes interference. Moreover, when Fraser decided to renounce the union, Petri gave him a prepared letter of withdrawal to sign.

Around August 1, 1957, the management continued its coercive interviews by questioning Larson and Wolford, two other drivers, about their union status. When they refused to withdraw from the union, plaintiff gave them a week's termination notice, but on August 3, 1957, placed a notice on its bulletin board offering them reinstatement. There is uncontradicted testimony that this offer did not indicate any change in plaintiff's attitude. Larson testified that he refused to return because "Mr. Petri had made it clear to me that he wasn't going to accept the union so if I went back to work it would be under the same conditions and with no union. . . .'' He stated that on the occasion of a subsequent visit to the plant, Philbert, plaintiff's manager, saw him talking to some of the drivers and told him that ". . . he would just as soon the way I felt that I wouldn't remain around the plant or any of his drivers.'' Since there is no suggestion that Larson was interrupting the drivers' work, this statement can only mean that plaintiff did not want its men exposed to union supporters, and, therefore, that its opposition to defendant's organizational efforts had not ceased. Wolford accepted reinstatement, but went on strike with the other drivers and later sought temporary employment elsewhere.

On August 6, 1957, defendant notified plaintiff by mail that it had authorization cards from nine of the ten drivers and requested a meeting with the management. At a meeting on

August 7th, plaintiff's attorney stated that Petri would not recognize any union. Following this meeting with the union representatives, Petri called a meeting of the drivers and expressed the hope that they would work as usual the following day despite an expected picket line. Fraser testified that some of the drivers had refused to sign plaintiff's withdrawal letter and that he understood the purpose of the meeting was to give them "a last chance" to withdraw. Wolford testified that plaintiff's attorney stated to the drivers that plaintiff "just wasn't going to recognize a union as a bargaining agent." Thus, before the strike began, plaintiff interfered with the drivers' freedom of choice by compelling at least three of them to choose between joining the union and continuing to work for plaintiff.

On the morning of August 8, 1957, eight of the ten drivers met in the union offices and voted unanimously to strike. One of them, Max Williams, had previously signed a withdrawal letter. When the strike began, nine of the drivers did not report to work. Later in the day, plaintiff delivered a truck to Fraser at his home and he drove his route that day and continuously thereafter. After about a week, two of the strikers, Williams and Cohee, returned to work. Six drivers who remained with the union were replaced by nonunion employees.

Charles Bard, who had previously worked for plaintiff, was hired on August 8th as the drivers' route supervisor. Shortly after the strike began, he talked several times with Petri as well as with plaintiff's attorney and John Philbert, plaintiff's plant manager, about forming an inside union. They told him that such a union would have to be formed by the employees "in order for it to be legal." Petri said that the Bowen strike[4] had been broken by an inside union. Philbert asked him which men would be loyal to plaintiff if an inside union were formed, and Bard suggested Don Burns, the driver who had not signed

[4]The Bowen Cleaners are located in Santa Ana and operate a business similar to plaintiff's. In March or April, 1957, a number of the Bowen route drivers went on strike to secure recognition of another union as their bargaining agent. Some time after the strike and peaceful picketing began, an association composed of the replacement drivers was formed, largely through the assistance of one R. N. Meader. Shortly thereafter, the company attorney (who also represents plaintiff in this case) wrote to the union advising that a second union had been formed and recognized by the company, that a jurisdictional dispute existed, and instructed the union to cease picketing. When the union complied with that demand, no litigation resulted.

a union authorization card. They warned him that he could not initiate the formation of such a union because he was on the supervisory staff.

Burns testified that he had a conversation with Petri some time in September and that Petri told him that ". . . there was a man that had something to do with the Bowen strike, that he was negotiating with or had something to do with him, something in that manner and that he was gonna get one of the drivers and one of the girls in the office . . . to meet with him to see if we could form a company unit." Burns further testified that Petri requested him to keep the conversation secret, that "he didn't want anyone knowing about it." Although Petri testified that he did not know Meader, the outside organizer who had formed the employee's association at the Bowen plant, he did not deny that he suggested the idea of a company unit to Burns. Burns later refused to join the Association and voluntarily left plaintiff's employ during the hearing. He stated that he left because "I don't think that we got any benefits in this company union. I don't think we are gonna get any benefits from it, not in my opinion."

A maintenance man, Roland Matthews, testified that he undertook to set up an inside union, primarily ". . . to get the plant settled down and get over the tension and so forth." He learned of the Bowen strike around September 1st. Shortly thereafter, he asked Philbert if plaintiff would negotiate with an independent union. Philbert told him a few days later that it would. Thereafter Matthews got in touch with Bowen, who referred him to Meader. Matthews talked to Meader on the telephone but they did not meet at that time.

Some time in December Matthews read a newspaper account of the formation of an independent association at a laundry in Los Angeles. He spoke to the president of that association about the organization of such a group. He testified that he had heard a rumor that defendant's picketing of plaintiff's plant would increase after Christmas. He approached Petri and told him ". . . that I was ready to go ahead with the formation of the independent association if he was still in accord with it, and if I start what assurance would I have or could I assure the employees that he would take no part in it, meaning that there would be no discrimination against anyone that did take part in it, and he told me there wouldn't be. If I needed any farther assurance to tell them to come and ask him." Philbert later instructed Bard to inform any

of the drivers who might inquire that the inside union "met with the complete approval of the company." Petri's repeated assurances that he would recognize the Association contrasted with his refusal to recognize defendant made clear to the employees that plaintiff would bargain only with an unaffiliated organization. Thus, plaintiff forced its workers to accept the organization that bore plaintiff's stamp of approval before it was even formed or to forego collective bargaining altogether.

Matthews made an appointment with Meader and took a list of the names and addresses of plaintiff's employees from the company bulletin board to show Meader. At their first meeting, shortly after Christmas, Meader told Matthews that his fee for helping to organize the Petri employees would be $250 and inquired whether his fee would be paid by Matthews or Petri. Matthews paid the fee himself and testified that no one had arranged to repay him. Meader selected two drivers and two inside employees from the list. Within a few days these four employees met with Matthews and Meader at Matthews' apartment building and arranged for an organizational meeting on January 8, 1958. Plaintiff refused Matthews' request to hold the meeting on company property. He then arranged to rent a hall a block away from the plant for the meeting. A few days before the meeting, he spoke to Burns about joining the Association. Burns stated that Matthews ". . . asked me if I was interested in getting the pickets off the front. . . ." Matthews also circulated a petition among the employees stating: "We the undersigned agree to go along with the majority in forming an Independent Laundry and Dry Cleaning Association of driver salesmen and plant employees of Petris Cleaners." Of 18 employees who signed the petition, Archie Fraser was the only driver.

Normally the men stayed on their routes, either making deliveries or soliciting new customers, until 5 p.m. Bard testified that Philbert instructed him to tell the drivers to come in at 4 p.m. January 8th to attend the meeting and that ". . . he smiled and said, 'We are not supposed to know anything about this meeting.' " Bard and Philbert, pursuant to Petri's orders, walked around the building in which the meeting was being held to prevent trouble. That the Association's organizational meeting was guarded by plaintiff's manager and its supervisor indicates plaintiff's interest in having the inside unit formed. (Compare *National Labor Relations Board* v.

*Vermont American Furn. Corp.*, 182 F.2d 842, 843-844, holding the presence of employer's plant manager, treasurer and superintendent in a hotel lounge adjacent to a lobby in which the outside union was holding an organizational meeting improper surveillance by the employer.)

The meeting, which began at 5 p.m., was attended by all eight drivers, four of whom had replaced the strikers, and about seven of the inside employees. Meader explained the method of organization. The group agreed upon a single organization with two separate bargaining units and elected Archie Fraser chairman for the drivers and Matthews chairman for the inside workers. Meader gave Matthews a form letter to use in demanding recognition. Matthews took the letter to plaintiff's main office around 6 p.m. and one of plaintiff's employees typed a copy of the letter. Matthews then gave it to Petri. At that time, none of the drivers except Archie Fraser had stated in writing that he wished to join the Association.

Plaintiff's attorney notified defendant in a letter dated January 9, 1958, that "as of this date a contract has been entered into" between plaintiff and the Association; that "all of the employees of Petri Cleaners, Inc., are members of said Association"; and that defendant's picketing constituted a violation of the Jurisdictional Strike Act.

Bard testified that on January 10th a letter arrived from plaintiff's attorney addressed to Otto Petri. Petri then sent for Archie Fraser and told him to sign a certain paper. Fraser did so, and upon leaving Petri's office met one of the drivers who asked him what he had signed. After a short discussion, Fraser returned to Petri's office to reread the paper and told the driver it was a recognition agreement. Fraser's statement ". . . started off a bombshell in the back because the drivers said that nobody had given Archie authority to sign anything like that."

The agreement, dated January 9th, provides that plaintiff recognizes the Association "as the exclusive collective bargaining agency for all route salesmen," that plaintiff promises "to sit down and consult with said Association and attempt to arrive at a working agreement controlling wages, hours and working conditions and other fringe benefits" and not to recognize any other labor organization for a period of 120 days and that the Association promises not to strike or affiliate with any other labor organization for 120 days. Fraser testified on

cross-examination that he had not requested any of the terms of this contract except the recognition clause and that none of its provisions were submitted to the other employees for their approval.

On January 14, 1958, plaintiff called a meeting of all its employees during working hours. At that time, plaintiff's counsel asked them all to sign an affidavit stating that they belonged to the Association; that the Association was "freely and voluntarily formed by the undersigned employees, without coercion, financial aid, domination, or interference from Petri Cleaners, Inc."; and that they did not wish to be represented by defendant. Bard testified that he stated to the group that he would not sign the affidavit at that time if he were a driver. All the drivers were present, but only two signed the affidavit. Following the meeting, Philbert asked Bard why he had influenced the drivers not to sign when their signatures would be favorable to the company. Bard stated that he thought the drivers should not relinquish their sole weapon, and Philbert did not reply.

After obtaining the affidavit, plaintiff commenced this action on January 14th, and requested a temporary restraining order to remove the pickets. The court denied plaintiff's request after defendant's attorney contended that the absence of any contract covering wages, hours or working conditions created doubt as to the bona fides of the Association. At about 5:30 p.m. of the same day, Petri conferred with his attorney, and then sent for Archie Fraser. Petri told Fraser that he wanted to negotiate a contract with the drivers immediately, and asked Fraser to submit a list of suggestions by January 15th. Fraser's request for an additional day was granted. On January 15th a meeting of all employees and a separate meeting of the drivers were advertised on the company bulletin board and held on company property—privileges extended to the Association, but not to defendant. Bard again instructed the drivers to return to the plant at 4 p.m. At the first meeting, held after 5 p.m., Meader presented forms of a constitution, bylaws, and a union contract. These documents were turned over to a committee. At their own meeting, the drivers made individual written suggestions, which Fraser compiled and submitted to plaintiff.

On January 16th all the drivers but one met from 6 to 9:30 p.m. on company property with Petri, Philbert, plaintiff's attorney and Bard, the route supervisor. Bard testified that one

of the drivers asked why the negotiations were being pushed so fast and stated that ". . . the whole thing to him appeared that it was just a matter of, a question of getting the pickets off and getting very little back in return for it." Later, plaintiff's attorney stated that ". . . he would get the papers back as quickly as possible because—in order that everybody could sign the contract in order to present—to give a stronger case in court." Discussion centered around the drivers' suggestions and the Bowen contract as a model. Plaintiff's attorney stated that he would draft a contract in line with the understanding of the group. The haste with which plaintiff signed a contract with the drivers stands out in striking contrast with the fact that there have been no negotiations, and no plans for any between the inside plant employees and the company.

Bard also testified that the next morning Philbert ". . . called me outside and said he'd like to thank me for the help that I had given them on a couple of points and that he and Mr. Petri had been afraid prior to that that I was definitely on the wrong side and influencing the drivers in the wrong way and they were glad to see that I had taken a different attitude at that meeting." This conversation was the third that Bard reported between him and Philbert. The first, it will be recalled, was Philbert's instruction that Bard advise the drivers that plaintiff completely approved of the Association. The second took place after the presentation of plaintiff's affidavit, when Philbert asked Bard why he had influenced the drivers not to sign the document. The clear purport of these conversations between plaintiff's plant manager and its route supervisor was to urge Bard to influence the drivers to support plaintiff against defendant. Bard testified for defendant under subpoena. He stated that Petri informed him prior to his appearance as a witness that Petri was considering the abolition of his job as route supervisor, but that Bard could take one of the routes if any were available.

Plaintiff received a draft of the contract on January 20th. Although dated January 20th, it was not signed by the drivers or the company until the morning of January 22nd, the date of the hearing on the order to show cause. Petri testified that he wanted the contract dated February 3rd, but the drivers wanted it effective January 20th. Of the seven drivers who signed the contract, three were among the original ten drivers and four were replacements of the strikers. The contract contains a recognition clause, a union security clause, a no-strike

clause, a promise by the Association not to affiliate with any other labor organization, and provisions relating to wages, hours, vacations and holidays.

The undisputed evidence,[5] viewed in light of our interpretation of section 1117, establishes as a matter of law that plaintiff "interfered with" the Association. Thus, to reiterate only the more obvious of plaintiff's departures from its required role of impartiality, its president and plant manager conducted coercive interrogations, giving several drivers the "choice" of renouncing union membership or being discharged; plaintiff provided its drivers with a prepared letter of withdrawal from defendant's organization and initially discharged two drivers who refused to withdraw; plaintiff repeatedly announced that it would not bargain with defendant, while at the same time encouraging the formation of the Association through its assurances that the inside group enjoyed plaintiff's complete approval, and plaintiff permitted the Association to use its property and bulletin board at all meetings following the organizational meeting—a privilege it did not extend to defendant.

Since plaintiff's conduct clearly constitutes interference, the Association was not a labor organization within the meaning of section 1117. There was therefore no jurisdictional strike under section 1118 and the order granting a preliminary injunction against defendant's strike must be reversed.

The question remains whether the trial court erred in denying defendant's motion for a preliminary injunction to compel plaintiff to recognize defendant as the exclusive bargaining agent for plaintiff's drivers.

An employer's decision whether or not to bargain with a labor organization has long been determined in this state by the free interaction of economic forces. Early cases established the legality of concerted activities for proper labor objectives under common law principles (*J. F. Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581, 599-600 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550]; *Pierce* v. *Stablemen's Union,* 156 Cal. 70, 75-76 [103 P. 324]). Sections 920-923 of the Labor

---

[5]Plaintiff's reliance upon its affidavits to raise a conflict is misplaced because its affidavits are drawn in conclusionary terms. Affidavits that merely state conclusions of law are not evidence (*Moon* v. *Moon,* 62 Cal. App.2d 185, 187 [144 P.2d 596]; *People* v. *Thompson,* 5 Cal.App.2d 655, 664 [43 P.2d 600]) and do not create a conflict as to the facts (*Coen* v. *Watson,* 105 Cal.App. 297, 300 [287 P. 525]).

Code[6] imposed certain restrictions on the employer only ''to balance the industrial equation, so far as it is possible to do so, by placing employer and employee on an equal basis.'' (*Shafer* v. *Registered Pharmacists Union,* 16 Cal.2d 379, 385 [106 P.2d 403].) Thus, section 921 provides that promises embodied in yellow-dog contracts shall not be enforced. Section 922 provides that any person who coerces another to enter into such a contract as a condition of employment is guilty of a misdemeanor. Section 923 announces it the public policy of this state ''to uphold the freedom of employees to organize and enter into collective bargaining contracts for their own protection.'' (*Levy* v. *Superior Court,* 15 Cal.2d 692, 704 [104 P.2d 770, 129 A.L.R. 956].) These

[6]Section 920: ''As used in this chapter, unless the context otherwise indicates, 'promise' includes promise, undertaking, contract, or agreement, whether written or oral, express or implied.''

Section 921: ''Every promise made after August 21, 1933, between any employee or prospective employee and his employer, prospective employer or any other person is contrary to public policy if either party thereto promises any of the following:

'' (a) To join or to remain a member of a labor organization or to join or remain a member of an employer organization,

'' (b) Not to join or not to remain a member of a labor organization or of an employer organization.

'' (c) To withdraw from an employment relation in the event that he joins or remains a member of a labor organization or of an employer organization.

''Such promise shall not afford any basis for the granting of legal or equitable relief by any court against a party to such promise, or against any other persons who advise, urge, or induce, without fraud or violence or threat thereof, either party thereto to act in disregard of such promise.''

Section 922: ''Any person or agent or officer thereof who coerces or compels any person to enter into an agreement, written or verbal, not to join or become a member of any labor organization, as a condition of securing employment or continuing in the employment of any such person is guilty of a misdemeanor.''

Section 923: ''In the interpretation and application of this chapter, the public policy of this State is declared as follows:

''Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.''

sections do not preclude promises to join independent labor organizations (*Shafer* v. *Registered Pharmacists Union, supra,* at 386-387), closed or union shop contracts, or concerted activities to obtain such contracts. (*McKay* v. *Retail Auto. S. L. Union No. 1067,* 16 Cal.2d 311, 327 [106 P.2d 373]; *Shafer* v. *Registered Pharmacists Union, supra,* at 387; *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389, 396 [106 P.2d 414]; *Park & T. I. Corp.* v. *International etc. of Teamsters,* 27 Cal.2d 599, 609-612 [165 P.2d 891, 162 A.L.R. 1426].) Neither do they place on the employer an affirmative duty to bargain, as the opening sentence of section 923 makes clear: "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees." An employer faced with a union's demand for recognition still has "the choice of yielding to the union's demands or continuing to endure the interference with its business relations which the (union's) activities caused." (*C. S. Smith Met. Market Co.* v. *Lyons, supra,* at 397.)

The Jurisdictional Strike Act (Lab. Code, §§ 1115-1120, 1122)[7] was designed, not to diminish free competition

[7]Section 1115: "A jurisdictional strike as herein defined is hereby declared to be against the public policy of the State of California and is hereby declared to be unlawful."

Section 1116: "Any person injured or threatened with injury by violation of any of the provisions hereof shall be entitled to injunctive relief therefrom in a proper case, and to recover any damages resulting therefrom in any court of competent jurisdiction."

Section 1117: "As used herein, 'labor organization' means any organization or any agency or employee representation committee or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work, which labor organization is not found to be or to have been financed in whole or in part, interfered with, dominated or controlled by the employer or any employer association within one year of the commencement of any proceeding brought under this chapter. The plaintiff shall have the affirmative of the issue with respect to establishing the existence of a 'labor organization' as defined herein.

"As used herein, 'person' means any person, association, organization, partnership, corporation, unincorporated association, or labor organization."

Section 1118: "As used in this chapter, 'jurisdictional strike' means a concerted refusal to perform work for an employer or any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or arising out of a controversy between two or more labor organizations as to which of

between labor and industry, but to release an innocent employer caught between the rival claims of two or more labor organizations. It does not apply unless there are at least two "labor organizations" within the meaning of section 1117, and the prohibited activity arises out of a dispute between them as to which has the exclusive right to bargain with an employer or to have its members work for him. (Lab. Code, § 1118; *Seven-Up etc. Co.* v. *Grocery etc. Union*, 40 Cal.2d 368, 381 [254 P.2d 544, 33 A.L.R. 327].) The employer may not only enjoin a jurisdictional strike (Lab. Code, § 1116) but refuse to bargain with either organization.

 It is for the Legislature to determine whether voluntary bargaining should now be displaced by a rule compelling the employer to bargain with the representatives of a majority of his employees. Recognizing that trial courts are hardly labor relations boards, defendant requests affirmative relief, avowedly because the record is so clear as to raise only issues of law. But, as the United States Supreme Court observed of a similar argument, "we write not only for this case and this day alone, but for this type of case." (*Carroll* v. *Lanza*, 349 U.S. 408, 413 [75 S.Ct. 804, 99 L.Ed. 1183].) A host of problems attend compulsory bargaining that only the Legislature can resolve. What constitutes an appropriate bargaining unit? (See §§ 8 (a) (3) (i); 9 (b); 29 U.S.C. §§ 158, 159.) How is the majority's choice to be determined? (See § 9 (c) (1); 29 U.S.C., § 159.) Which employees constitute the relevant majority, those presently employed or those employed at the time the employer's refusal to bargain precipitated the strike? Congress recently changed the federal definition of the relevant majority. The Labor Management Relations Act of 1947 provided that "Employees on strike who are not entitled to reinstatement shall not be eligible to vote."

---

them has or should have the exclusive right to have its members perform work for an employer."

Section 1119: "Nothing in this chapter shall be construed to interfere with collective bargaining subject to the prohibitions herein set forth, nor to prohibit any individual voluntarily becoming or remaining a member of a labor organization, or from personally requesting any other individual to join a labor organization."

. . . . . . . . . . . .

Section 1122: "Any person who organizes an employee group which is financed in whole or in part, interfered with or dominated, or controlled by the employer or any employer association, as well as such employer or employer association, shall be liable to suit by any person who is injured thereby. Said injured party shall recover the damages sustained by him and the costs of suit."

(§ 9 (c) (3); 29 U.S.C., § 159.) Dissatisfaction with this rule (see, e.g., *Right to Vote During an Economic Strike*, 16 U. of Chi.L.Rev. 537) led to the 1959 provision that "Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this Act in any election conducted within twelve months after the commencement of the strike." (Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 702.) The enforcement of the duty to bargain under the federal act has been practicable only because the necessary administrative machinery and statutory guides have been provided. This court cannot usurp legislative power by enacting rules of law patterned on the Labor Management Relations Act, and it cannot create the administrative machinery necessary to make such rules workable.

Defendant contends, however, that three decisions of this court lead to compulsory bargaining. (*Garmon* v. *San Diego Bldg. Trades Council,* 49 Cal.2d 595 [320 P.2d 473]; *Chavez* v. *Sargent,* 52 Cal.2d 162 [339 P.2d 801]; *Retail Clerks' Union* v. *Superior Court,* 52 Cal.2d 222 [339 P.2d 839].) By reinterpreting section 923 of the Labor Code and invoking the Jurisdictional Strike Act, the court in the Garmon case held that a closed or union shop contract is an unlawful labor objective under state law when none of the employees wish to join or be represented by the union. The court's conclusion that by signing a closed or union shop agreement the employer would interfere with his employees' rights "in the designation of . . . representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" (Lab. Code, § 923) in violation of section 923 was directly contrary to the settled rule that section 923 does not restrict the right of labor to engage in concerted activity to attain a closed or union shop. (*Shafer* v. *Registered Pharmacists Union, supra,* at 387.) Furthermore, the Garmon case was decided on the erroneous assumption that the conduct found tortious under state law was also illegal under federal law, and it was reversed on the question of federal pre-emption in *San Diego Bldg. Trades Council* v. *Garmon,* 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775].

In *Chavez* v. *Sargent, supra,* this court departed from rules based on the free interaction of economic forces and determined that collective bargaining must be pursued or not ac-

474

cording to the wishes of the majority of the employees directly involved. Under the reasoning of that case, the employer cannot interfere with the majority's freedom of self-organization by agreeing to bargain with any agent other than the majority's chosen representative. It follows that he may not stultify the majority's choice by refusing to bargain at all. Otherwise, the requirement of majority rule, instead of aiding the majority's efforts for collective bargaining, would benefit only the employer who could defeat the efficacy of the majority's choice of a representative. Unless the employer recognizes the majority's chosen representative, he necessarily interferes with the majority's freedom of choice by preventing its practical culmination.

In undertaking to restate the labor law of California, however, the Chavez case went beyond the issue before the court. To support the holding that the local ordinance there involved was invalid, it was necessary only to decide that concerted activity to secure closed or union shop contracts and contracts resulting therefrom were protected as part of the workman's "full freedom of association, self-organization, and designation of representatives of his own choosing." (Lab. Code, § 923.) By going further and setting up a new system of labor law based on majority rule instead of the free interaction of economic forces, the case would turn our trial courts into labor relations boards without legislative guidance or necessary administrative machinery.

These difficulties may not have been foreseen when the dicta in Chavez were applied in *Retail Clerks' Union* v. *Superior Court, supra,* to enjoin concerted activity that was theretofore clearly legal. Since none of the employees there involved had designated the picketing unions as their bargaining representatives, no problem of determining the relevant majority was presented. The problems that lay dormant in this negative application of the Chavez case cannot be escaped, however, when, as in this case, its positive corollaries are sought to be enforced. In this type of case, the trial court is asked to sit as a labor board and thus determine the appropriateness of bargaining units, conduct elections, certify the majority representative, and direct collective bargaining.

We conclude that employers are not required by law to engage in collective bargaining and that closed or union shop agreements and concerted activities to achieve them are lawful in this state whether or not a majority of the em-

ployees directly involved wish such agreements. If a contrary rule is to be established, the Legislature, not this court, must enact it. The Garmon and Retail Clerks' Union cases are, therefore, overruled. Insofar as it is inconsistent with the views expressed herein, the Chavez case is disapproved.

The order granting plaintiff's motion for injunctive relief is reversed and the order denying defendant's motion for injunctive relief is affirmed.

Gibson, C. J., Peters, J., and White, J., concurred.

SCHAUER, J., Dissenting.—On May 19, 1959, in *Chavez v. Sargent,* 52 Cal.2d 162 [339 P.2d 801], we reviewed the policy and effect of section 923 of the Labor Code and related statutes (Lab. Code, §§ 920-923, 1115-1122, 1126), and a majority of this court recognized the following propositions: " [Pp. 186-187 [14] of 52 Cal.2d.] It is of primary importance that the individual workman have protection—that *he* have 'full freedom' of 'self-association' and in the designation of representatives of 'his own choosing.' But it is also essential that the group's lawfully selected negotiators have power and freedom of contract to secure the workman's interests by contract with employers, and that for the ultimate benefit of each individual workman the authorized representative shall be able to wield the collective power of all. . . .

" [P. 197 [29] *id.*] If employes have voluntarily become members of any 'labor organization' (not financed or interfered with by their employer, Lab. Code, § 1117) and have thereby or therein selected and authorized a bargaining agent, such agent and the employer are free to bargain for the respective legitimate objectives of both workmen and employer. The ensuing collective agreement may, of course, include provisions for union security, such as a union shop, maintenance of membership, and exclusive bargaining rights with the employer. . . .

" [P. 198 [32] *id.*] The right of the workman to participate in the selection of his bargaining agent and in the government of his union is the workman's right of self-determination. Organization and collective bargaining are but tools to that end. . . .

" [P. 203 [37] *id.*] It is a primary rule that 'courts are bound to give effect to statutes according to the usual, ordinary

import of the language employed in framing them.' (*In re Alpine* (1928), 203 Cal. 731, 737 [3] [265 P. 947, 58 A.L.R. 1500].) ...

"[Pp. 205-206 [45, 46] *id.*] For an employer to notify his employes that he has agreed with a union which is, and which he knows to be, unauthorized and unwanted by his employes, that they must join such union and be represented by it or be dismissed from employment would appear to constitute an unlawful interference by the employer and subject him to the liability imposed by section 1122.

"Industrial self-government is a goal to be desired. Insofar as problems arise over issues which are not specifically covered by legislation they should be 'solved by looking to the policy of the legislation and fashioning a remedy that will effectuate that policy.' (See *Textile Workers Union* v. *Lincoln Mills* (1957), ... 353 U.S. 448, 457 [77 S.Ct. 912, 1 L.Ed.2d 972].) ...

"[P. 212, footnote 14, *id.*] It should be noted that where an organization which has been fairly selected by the majority vote of all the employes of an employer (or of an affected craft or group) seeks union security [or other lawful objective], the organization acting for all such employes may use lawful forms of pressure (e.g., the strike, picketing, etc.) to induce the employer to grant that condition of labor. From what has hereinabove been said in the discussion of sections 921 and 923 it is obvious that the freedom declared is the freedom from employer interference in such matters as association, organization and selection of representatives, to the end that through the democratically chosen representatives collective bargaining agreements may be negotiated. The workmen, having had the opportunity to freely participate in such procedures, are, of course, bound by the majority vote, and the contract negotiated will be the contract of all. . . .''

Today a differently constituted majority disapprove those views and overrule *Garmon* v. *San Diego Bldg. Trades Council* (1958), 49 Cal.2d 595 [320 P.2d 473], and *Retail Clerks' Union* v. *Superior Court* (1959), 52 Cal.2d 222 [339 P.2d 839]. Of course, as a matter of law, the majority possess the power to overrule the above cited cases. They have so used that power; whether wisely or otherwise remains to be seen.

It is my view that the majority action inevitably will set back, for we know not how long nor how repercussively, the cause of law-guided and peacefully negotiated settlements of

labor disputes in California industry.[1] I think that by the majority's action workmen will suffer; employers will suffer; the public will suffer; unions and union leaders who prefer self-government under law will suffer; only those union organizers who eschew responsibility under law and who have no regard for the general welfare and freedom of the individual workman will prosper.

Each of those facts appears implicit in the express "disapproval" of *Chavez* v. *Sargent* and the overruling of Garmon and Retail Clerks' Union. Prominent among the Chavez and Garmon rulings which are disapproved and overruled is the holding that it is unlawful for an employer to make a contract with a labor "organizer" who represents none of the affected employes whereby the employer agrees that he will compel his workmen, on pain of discharge, to join the organizer's union and to "consent" that the employer shall deduct "dues" from the employes' pay checks for remittance to their "organizer"—their unchosen and unwanted "representative." The majority's ruling means also that if the employer does not voluntarily agree to sign such contract, when demanded by the "organizer," the latter may place pickets around the employer's plant and damage or destroy the business. Thus "blackmail picketing" is restored in California.

Not only do the new majority disapprove or overrule the cited cases; they also hold that Labor Code, section 923, either does not mean what its words say or that it is unenforcible for want of further statutory implementation. The essential words of section 923 as enacted by the Legislature are: "[T]he public policy of this State is declared as follows: Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. . . . In

---

[1] The overruling today of Garmon, resulting in re-creation of a "no-man's land" in California, seems peculiarly lamentable because under the Labor-Management Reporting and Disclosure Act of 1959 it is expressly provided that the state courts shall be competent to exercise jurisdiction in the "no-man's land" which formerly existed when the National Labor Relations Board refused to exercise jurisdiction over a dispute, such as that in Garmon, which affected interstate commerce. (*Garmon* v. *San Diego Bldg. Trades Council* (1958), *supra*, 49 Cal.2d 595, 598.)

Section 14(c)(2) of the National Labor Relations Act now provides that "Nothing in this Act [National Labor Relations Act as amended] shall be deemed to prevent or bar . . . the courts of any State . . . from assuming and asserting jurisdiction over labor disputes over which the Board declines . . . to assert jurisdiction."

dealing with . . . employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the *individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing,* to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (Italics added.) Those words and the policy they enunciate seem clear enough to me to be understandable and enforcible.

But the new majority say, "It is [still] for the Legislature to determine whether voluntary bargaining should now be displaced by a rule compelling the employer to bargain with the representative of a majority of his employees." (P. 472 [9], *ante.*) "Voluntary bargaining," the new majority further hold, may be bargaining not even participated in by the workmen but solely between an employer coerced by picketing or threats of picketing and an "organizer" who represents none of the affected employes but who wants to add them to his dues-paying but non-franchised constituency—his stock in trade.

The new majority hold that in California the employes need not be permitted to participate in selecting "their own" bargaining representatives; that such employes, if the "organizer" and employer so agree, must accept the unwanted organizer (or his union, if in fact he represents any existing organization) as their "representative" or be discharged from employment. This action by the employer, the majority hold, notwithstanding the provisions of Labor Code, sections 923 and 1117[2] and related sections, does not constitute "interference" by the employer. Such majority hold that section 923 cannot be enforced because "A host of prob-

---

[2]Section 1117 provides, "As used herein [Jurisdictional Strike Law], 'labor organization' means any organization or any agency or employee representation committee or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work, which labor organization is not found to be or to have been financed in whole or in part, interfered with, dominated or controlled by the employer or any employer association within

lems attend compulsory bargaining [if attempted by employes but not if conducted by a self-appointed "organizer"] that only the Legislature can resolve. [The host of insurmountable problems are:] What constitutes an appropriate bargaining unit? . . . How is the majority's choice to be determined? . . . Which employees constitute the relevant majority . . .?" (P. 472, *ante.*) Therefore, it is held, the "individual workman," whose "full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment" is so unequivocally expressed in section 923, is in truth not even entitled to vote in the selection of his bargaining representative. In my opinion, as explained in more detail *infra*, p. 494 et seq., the courts of California are capable of dealing with these and related problems and refusal to undertake solution of such problems is a gratuitous and unwarranted assertion of judicial impotence.

It is to be observed that the demanding organizer's union (assuming that he actually represents an already existing organization) which, by the majority holding, may properly force the employer both to bargain with it and to force his unwilling employes to join, need not be a genuine, reputable labor organization in any sense of the word. It need not give the employes who are compelled to accept it as their representative any voice in the terms of employment which it negotiates for them or any choice as to what officer or agent of the union shall speak for them in the negotiations. All the employe need receive from the union is the "right" to carry a union card in return for the "privilege" and "duty" of paying dues, together with such rights as the courts somehow have managed in the past to recognize and protect without statutory guidance (e.g., the right not to be arbitrarily excluded from union membership where the union has attained a monopoly of the supply of labor by means of closed shop agreements (*James* v. *Marinship Corp.* (1944), 25 Cal.2d 721, 730-731 [4] [155 P.2d 329, 160 A.L.R. 900]) and the right not to be disciplined or expelled from the union without notice, hearing, opportunity to confront and cross-examine his accusers and to examine and refute the evidence

one year of the commencement of any proceeding brought under this chapter. The plaintiff shall have the affirmative of the issue with respect to establishing the existence of a 'labor organization' as defined herein. . . .''

against him (*Cason* v. *Glass Bottle Blowers Assn.* (1951), 37 Cal.2d 134, 143-144 [12, 14, 15] [321 P.2d 6, 21 A.L.R.2d 1387]).

The present majority's concept of what constitutes ''freedom'' of self-organization and ''voluntary'' bargaining, it seems to me, is definitely opposed not only to the statutes of California but also to widely expressed recent thinking in the field of labor-management-individual-workman relations, as evidenced, for example, by the federal Labor-Management Reporting and Disclosure Act of 1959. That act provides, among other things, a ''Bill of Rights[3] of Members of Labor Organizations,'' with the following requirements:

Section 101(a)(1): ''Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or refendendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.''

Section 101(a)(2): ''Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views . . ., and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules . . .''

Members are given a voice, either by direct vote or vote of their representatives, as to increase of dues or levy of assessments, ''[e]xcept in the case of a federation of national or international labor organizations'' (§ 101(a)(3)); their right to sue in the courts or seek relief before administrative agencies is protected (§ 101(a)(4)); and it is provided that they cannot be disciplined except for nonpayment of dues

[3]In *Chavez* v. *Sargent* (1959), *supra,* 52 Cal.2d 162, 194 [27] it is noted that ''As nearly as labor may be said to have a governmentally declared Bill of Rights in California, it is that enunciated in section 923. It is that section which undertakes to insure to each individual workman freedom to associate, to organize, to select representatives to negotiate for his group, and through those representatives and the strength of his organization, to bargain collectively. In particular it is that section which provides for the workman whatever democracy there may be in his union.''

The most fundamental of the same elements of protection to workmen as are defined in the 1959 federal act were in California's Bill of Rights (enumerated in Lab. Code, § 923, and related sections) as recognized and upheld (until disapproved today) in *Chavez* v. *Sargent.* (See *id.,* pp. 191-192 [20-26].)

without being served with specific written charges, given reasonable time to prepare a defense, and afforded a full and fair hearing (§ 101(a)(5)).

Specifically I note that no statutory scheme for protecting the foregoing rights is spelled out; the union member is simply given the right to "bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate" (§ 102). As hereinabove indicated, under California law, until today, the workman in intrastate commerce had in state courts an equivalent remedy for substantially similar rights.

I would also mention at this point that, adding to the difficulty of the California employe who is not subject to the federal labor acts is the further holding of the majority (hereinafter more fully discussed) that "when an inside union is formed behind picket lines close scrutiny of its genesis is required." (P. 461, *ante.*) Thus the invading union, however corrupt it may be, is, under the majority opinion, apparently subject to no scrutiny, but when it throws a picket line around a shop which the employes have chosen to keep unorganized, any labor organization formed by those employes in self-defense is suspect and likely, under the majority view, to be held to be a company-interfered-with group as a matter of law. As hereinafter explicitly shown, the majority today exemplify that principle and, by the extreme expedient of resolving conflicts in the evidence contrary to the resolution thereof by the trial judge, reach a directly contrary judgment.

One of the most important elements of the state's labor policy which is expressed in Labor Code, section 923—and which is today held unenforcible—is the provision for complete freedom of workmen in self-organization and selection of representatives of their own choosing. That element is important not only to give workmen the right of self-government in their own organization but also to guard against the rash acts which experience has taught us are likely to come from the concentration of unbridled power in one man or a small dominated group. The most basic principle of the California plan is destroyed when the right of direct control is taken from the workmen and given to a self-appointed organizer. The latter thus is enthroned not as a *representative* of the workmen but as their boss.

As recognized in *Chavez* v. *Sargent* (1959), *supra,* p. 185

of 52 Cal.2d, it is altogether clear that there are individual labor leaders and some followers who are averse to regulation by law or to the settlement of labor disputes through the judicial process. Illustrative of the preference by some labor leaders for settlement of disputes by means other than the relatively peaceful and restrained judicial process, and of the tactics to which they will resort when, for whatever reason, they eschew the law, are the facts in *People* v. *Osslo* (1958), 50 Cal.2d 75 [323 P.2d 397].[4]

[4]The Osslo decision affirms judgments of conviction of conspiracy to commit assault and of aggravated assault, arising out of a dispute in San Diego between the Clerks' union, which handled retail sales of frozen dinners, and the Butchers' union, which sought jurisdiction of such sales. The defendants were Osslo (an official of the Butchers' local, of the affiliated butchers' unions of California, and of the International Butchers' union), two business agents of the Butchers' local, and five men (Hazel, a Teamster, and Dimitratos, Cacio, Tucker, and Dempster, members of the Sailors Union of the Pacific) imported by Osslo from San Francisco through the Sailors Union and employed to act in connection with the dispute. (P. 89 of 50 Cal.2d.) "Representatives of the Butchers and the Clerks met [to discuss their conflicting claims] . . . The secretary-treasurer of the Clerks' local 'made demand upon Mr. Osslo . . . to have the merchandise in dispute . . . placed back under the jurisdiction of the Clerks, or our organization would take *every legal means* necessary to enforce the jurisdiction.' (Italics added.) Osslo 'pounded the table three times, stated he was boss of the West Coast and he would fight for jurisdiction. . . . [Four days before the assault] the Clerks filed with the National Labor Relations Board a petition 'for the purpose of having the Board determine who jurisdiction belonged to.' '' Business agents of the Butchers, with the imported sailors, "started calling on the markets." (Pp. 83-84 of 50 Cal.2d.)

During one of their visits to a market, as described by an eye witness and recounted in the opinion (p. 92 of 50 Cal.2d), "These five defendants [the sailors] surrounded Clerks Montgomery and Maurer and some of the defendants stomped on Montgomery's and Maurer's feet. 'Dimitratos and Hazel attempt[ed] to get Montgomery, but he . . . [though pursued] got away and they stepped right back out . . . Maurer couldn't get . . . past the customers because of a railing and a bunch of pushcarts . . . and he was being pursued . . . until two men got hold of him and held him . . .' Cacio struck Maurer in the stomach. Dempster and Tucker pinned Maurer's arms to his sides. 'Dimitratos judo chopped him terribly, fifteen or twenty shots,' and 'Hazel was bombing in with his fists and with judo chops.' Maurer was beaten and kicked. '[W]hen they let go and dropped him to the floor he was in kind of a hulk lying on his side. That is when Cacio used the boots on him. . . . Kicked him in the back twice and then he flopped over on his back and he was kicked, I think, right in the side terribly hard.' ''

Illustrating situations in which a union and its officers set in motion a picket plan, encouraged or evidenced irresponsibility in controlling and disregard of their duty to control their members' resort to violence and intimidation in violation of court order, and then sought to evade legal responsibility for the acts of the rank and file, are *Steiner* v. *Long Beach Local No. 128* (1942), 19 Cal.2d 676, 685-686 [6, 7] [123 P.2d 20] [union officers were present and directed picketing which included disorder and

The present majority of this court make it clear that they consider that the courts are powerless to protect the rights of the individual workmen and their freely chosen bargaining representative (as contemplated by Labor Code, section 923, and related statutes) in the absence of "necessary administrative machinery and statutory guides" (p. 473, *ante*) and that disputes with an employer who is not engaged in interstate commerce, or labor disputes which affect such commerce but as to which the National Labor Relations Board declines jurisdiction,[5] must be resolved by "the free [and destructive] interaction of economic forces" (p. 473, *ante*) such as those which have been at work in the subject dispute, without the aid of the judicial process. I cannot agree that the courts are so impotent or incompetent that they cannot or should not in a proper case give force to the statutorily declared public policy of this state in this important field. My views in this regard are stated in more detail *infra*, p. 492 et seq.

It appears to me that nationally the trend of thinking is generally toward firmer enforcement and further development of laws governing intra-labor group and labor-management excesses rather than toward relaxation and back-pedalling. In this regard I call attention to *United Steelworkers* v. *United States* (1959), 361 U.S. 39 [80 S.Ct. 1, 4 L.Ed.2d

violence in violation of a preliminary injunction, and personally participated in shadowing employes and customers of the picketed employer]; *Oil Workers Intl. Union* v. *Superior Court* (1951), 103 Cal.App.2d 512, 552 [18], 554-555, 565 [230 P.2d 71] [officers of the local union did not inform picketing members, who threw stones and made threats, of the terms of a temporary restraining order which the officers felt was "just another move on the part of the Company to break the strike and weaken the morale of the members"; the president of the international, in a speech to the members, asked them not to encourage violence "just so long as your picket lines remain inviolate"].

[5]We must recognize that the area in which conduct connected with a labor dispute was formerly irremediable even though it was tortious under state law and an unfair labor practice under federal law (see *Chavez* v. *Sargent* (1959), *supra*, 52 Cal.2d 162, 208-211) will probably be much reduced under the 1959 amendment of section 14 of the National Labor Relations Act to provide that "(c)(1) The [National Labor Relations] Board, in its discretion, may . . . decline to assert jurisdiction over any labor dispute . . . where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction . . . (2) Nothing in this Act shall be deemed to prevent or bar any agency or the courts of any State . . . from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction."

12, 169], in which the United States Supreme Court, per curiam, upholds an injunction obtained by the United States Attorney General under section 208 of the Labor Management Relations Act of 1947 as amended (29 U.S.C.A. § 178). That section provides that a district court, on petition of the Attorney General at the President's direction, has jurisdiction to enjoin a strike or lock-out "and to make such other orders as may be appropriate," if the court finds that such strike or lock-out affects an entire industry or a substantial part thereof engaged in interstate or foreign commerce or production of goods for commerce and will, if permitted, imperil the national health and safety.

In affirming the order of the court of appeals, which affirmed the district court's order against the contentions of the petitioner union, the supreme court says (p. 4 of 80 S.Ct.) : "The petitioner suggests that a selective reopening of some of the steel mills would suffice to fulfill specific defense needs. . . . There is no room in the statute for this requirement which the petitioner seeks to impose upon the Government. . . .

". . . Petitioner contends that the statute is constitutionally invalid because it does not set up any standard of lawful or unlawful conduct on the part of labor or management. But the statute does recognize certain rights in the public to have unimpeded for a time production in industries vital to the national health or safety. It makes the United States the guardian of these rights in litigation. [Citations.] The availability of relief, in the common judicial form of an injunction, depends on findings of fact, to be judicially made."[6]

The very fact of enactment by Congress and signing by the President of the Labor-Management Reporting and Disclosure Act of 1959 (1959 Pocket Part of (1956) 29 U.S.C.A.), providing a "Bill of Rights of Members of Labor Organiza-

---

[6]It is also to be noted that the vigorous language of Justice Brandeis, dissenting in *Duplex Printing Press Co.* v. *Deering* (1921), 254 U.S. 443, 488 [41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196]—declaring that the Legislature, in connection with industrial disputes, "may substitute processes of justice for the more primitive method of trial by combat"— now appears in the concurring opinion of Justices Frankfurter and Harlan (p. 182 of 80 S.Ct.), and those concurring justices pertinently add that sections 206 through 209 of the Labor Management Relations Act of 1947 as amended "were designed to provide machinery for safeguarding the comprehensive interest of the community, and to promote the national policy of collective bargaining. *They must be construed to give full effect to the protections they seek to afford.*" (Italics added.)

tions,'' much like California's Bill of Rights for workmen as recognized in *Chavez* v. *Sargent* (1959), *supra,* 52 Cal.2d 162, 194 [27], is strong evidence that there is a rising need for government under law in labor disputes, rather than for abdication of the court (decreed by the majority today) in favor of ''the free interaction of economic forces'' (p. 469, *ante*) such as those applied in this case—and on a larger scale in the recently abated and thereafter settled steel strike.

Lest it be urged that the above related actions of Congress and the President in 1959 have no popular support beyond the halls of Congress and the White House, it seems proper to quote from an address by Mr. Adlai E. Stevenson to the Institute of Life Insurance in New York City on December 8, 1959, as reported in the U. S. News & World Report (Dec. 21, 1959; vol. XLVII, No. 25, p. 104): ''The steel strike dramatizes the fact that we are now at the end of an era. Everybody is agreed that this cannot happen again; that the public interest is the paramount interest, and that irresponsible private power is an intolerable danger to our beleaguered society. . . .

''Where private groups—like big business or big labor—are performing public functions, they must be held to public responsibility. And one may forecast with some certainty that the Supreme Court will increasingly hold them to this responsibility. . . .

''In September it proved necessary, for the first time in our history, for Government to establish controls over the internal affairs of the labor unions—their constitutions, their elections, the administration of their offices—because of the irresponsibility of a comparatively few labor leaders. This was a failure, not just for the unions, but for democracy. The system is weaker today than it would have been if labor had done for itself what Government has now had to do for it.''

In the face of the facts recounted I deem it regrettable that California today steps backward.

Turning to the narrower aspects of the subject case, it is my further opinion that the evidence does not, as a matter of law, establish employer interference with the employes' association within the meaning of section 1117 of the Labor Code. I recognize that, so far as the evidence now before us discloses, defendant union, through an organizer authorized to do so, between June 27 and August 6, 1957, without im-

proper pressure obtained the freely chosen written authorization of nine of the ten drivers then employed by Petri that the union should represent them in collective bargaining.[7] During this period between June 27 and August 6, 1957, the employer threatened to discharge employes who chose to support the union; it did give notices of termination of employment to a driver who stated that "he was probably going to have to stay with the union" and a driver who "refused to tell him either way,"[8] and two other drivers signed letters prepared by the employer withdrawing their union authorization. Then the majority employes' freely chosen representatives visited the employer on August 7, 1957, and sought to begin negotiation of a contract, and the employer announced its refusal "to negotiate with any union." (By this, the trier of fact could properly understand, the employer meant what was said: "any union"; that is, *any* union whether organizer-dominated or employe-controlled, and whether international, national or local and independent.) The employer then called a meeting of the drivers and reiterated its refusal "to recognize a union as a bargaining agent." On the morning of August 8, 1957, eight of the drivers (including one who had signed a letter with-

---

[7] In this regard the nine drivers and defendant's organizer were exercising the rights referred to as follows in the Chavez case (pp. 203-204 [39] of 52 Cal.2d): "Section 1119, fitting the jurisdictional strike legislation into the policy generally enunciated in section 923, cautions that 'Nothing in this chapter shall be construed to interfere with collective bargaining *subject to the prohibitions herein set forth,* nor to prohibit any individual *voluntarily* becoming or remaining a member of a labor organization, or from personally *requesting* any other individual to join a labor organization.' (Italics added.) Again, it must be noticed, the Legislature carefully preserves the basic elements of collective bargaining which are declared in section 923 to be the policy of the state, including, of course, the specifically mentioned right of self-organization to that end, but makes it clear that the exercise of the right to bargain collectively is 'subject to the prohibitions herein set forth' and that such limitations do *not* 'prohibit *any* individual *voluntarily* becoming or *remaining* a member of a labor organization, or from personally *requesting* any other individual to join' (italics added) the organization, a right such as that which was upheld in *In re Porterfield* (1946), . . . 28 Cal.2d 91 [168 P.2d 706, 167 A.L.R. 675]."

[8] This sort of coercion against the employes' selecting the union of their choice as bargaining representative was as contrary to the statutory policy of this state as was the converse sort of coercion condemned in *Retail Clerks' Union* v. *Superior Court* (1959), *supra*, 52 Cal.2d 222, 224, and *Garmon* v. *San Diego Bldg. Trades Council* (1958), *supra*, 49 Cal.2d 595, 606-609, i.e., union coercion designed to force an employer to compel his employes to accept union representation which the employes have not freely chosen.

drawing his authorization to the union) met in the union offices and unanimously voted to strike. The strike and picketing then began.

At this point my view of the evidence (which is that of the trial court) differs from that of the majority. Here it should also be mentioned that this case originated in a trial court; that such court did see and hear witnesses testify; and that from its vantage point it found facts which fully support its orders. It is the duty of a reviewing court to approach its task imbued with a willingness to respect and support the law; to indulge all presumptions in favor of the regularity of the proceedings below and to examine the evidence only to find if there be any which the trial court could weigh and find sufficient. "The only conflict may be the opposing inferences deducible from uncontradicted probative facts." (*Ballard* v. *Pacific Greyhound Lines* (1946), 28 Cal.2d 357, 359 [3] [170 P.2d 465].) "In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183]; see also *Powell* v. *Pacific Electric Ry. Co.* (1950), 35 Cal.2d 40, 41-42 [216 P.2d 448]; *Callahan* v. *Gray* (1955), 44 Cal.2d 107, 111 [2, 3] [279 P.2d 963].) "The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict." (*Estate of Bristol* (1943), 23 Cal.2d 221, 223 [2] [143 P.2d 689].) Furthermore, this court no longer ago than 1956, in *Bailey* v. *County of Los Angeles,* 46 Cal.2d 132, 137 [3, 4, 5] [293 P.2d 449], unanimously reiterated the holding of *Murray* v. *Superior Court* (1955), 44 Cal.2d 611, 619 [6, 7, 8] [284 P.2d 1], that "[3] 'An appellate court will not disturb the implied findings of fact made by a trial court in support of an order, any more than it will interfere with express findings upon which a final judgment is predicated. [4] When the evidence is conflict-

ing, it will be presumed that the court found every fact necessary to support its order that the evidence would justify. [5] So far as it has passed on the weight of the evidence, its implied findings are conclusive. This rule is equally applicable whether the evidence is oral or documentary.' ''

In contrast, the majority today approach the issue of fact as follows: ''If the Association was 'interfered with, dominated or controlled' by plaintiff, it is not a 'labor organization' within the meaning of section 1117 and there has been no jurisdictional strike within the meaning of section 1118. The determination of this issue is crucial to defendant's appeal from the order granting a preliminary injunction against defendant's strike. In deciding that issue we must first interpret the terms 'interfered with, dominated or controlled' and then in the light of our interpretation determine whether plaintiff sustained its burden of proving that the Association is a labor organization.'' (P. 459 [3], ante.)

If we approach consideration of the above related evidence with fair and open minds and obedient to the rules previously established by this court and quoted above, it at once appears that the above described ''coercion'' of the employer designed to induce the drivers not to be represented by defendant or any union, need not be understood as ''interference'' with the subsequently organized Independent Association of Petri Employees. There is no evidence that the employer entered into a compact with any ''organizer'' agreeing to require the employes to join the organizer's association or any other group or suffer dismissal from employment. There is no evidence whatsoever that anyone had spoken of a company or independent union before August 8, when the strike and picketing began. It was only after the strike was under way that Charles Bard (hired as a supervisor on August 8) and Dan Burns (the one driver who had not authorized defendant union to represent him and who thereafter refused to join the Independent Association) spoke with representatives of the employer concerning the formation of an inside union.

Roland Matthews, the Petri employe who organized the Independent Association, testified that three or four weeks after the strike began he became interested in forming such an association because he heard from a Bowen employe (see majority opinion, p. 463, footnote 4) that the formation of an independent association at that plant had resulted in the

settlement of a labor dispute there; Matthews and other Petri employes felt that "the situation was a deadlock" and he wished "to get the plant settled down and get over the tension"; therefore, Matthews inquired of the employer's manager whether "Mr. Petri would go along with an independent association or organization and negotiate a working agreement" and Petri stated that he would do so but "he [Petri] could have nothing to do with it, which I [Matthews] knew he couldn't." Thereafter Matthews took no further action concerning the formation of the Association until December, 1957.

Although the evidence as to the genesis of the Association would support a finding that the employer "interfered" with it, in the sense of encouraging it, it does not appear to me that such a finding is as a matter of law compelled or that the contrary finding of the trial court is unsupported. The trial court could—and, if we follow the law we have often declared in other types of cases, we must presume did—believe that the testimony of Bard and Matthews as to statements of Petri and other representatives of management that they could have nothing to do with the formation of an independent organization indicated the intent of management not to interfere. It could and presumptively did believe that statements of representatives of management, made after the strike and picketing had begun, that Petri approved of and would recognize an independent organization were not made as encouraging ("interfering" with) its formation and did not have the effect of "dominating" or "controlling" the employes, but were made for the purpose of letting the employes know that despite Petri's long history of expressed antagonism toward unions—any unions and all unions—he was now coming to the point where he would not oppose the formation of an independent union or labor organization or insist that the employes who attempted to organize it must choose between employment with Petri and such organizational activity. The First Amendment protects the employer's right to noncoercive expression of its views on labor policies and problems. (*National Labor Relations Board* v. *Virginia Electric & Power Co.* (1941), 314 U.S. 469, 477 [62 S.Ct. 344, 86 L.Ed. 348]; *National Labor Relations Board* v. *Ford Motor Co.* (1940, C.C.A. 6), 114 F.2d 905, 913-915 [12-19], cert. den. 312 U.S. 689 [61 S.Ct. 621, 85 L.Ed. 1126].)

In December, 1957, Matthews began active organizational efforts. He again sought and received the assurance of Petri that there would be no discrimination against employes who participated in an "independent union." The only direct evidence that any representative of management gave Matthews any aid during his activities which led up to the organizational meeting of January 8, 1958, is the testimony of Bard, a supervisory employe, that at Matthews' request he recommended the names of two drivers who might assist in the formation of the Association.

The testimony that on January 8 representatives of management "instructed the drivers . . . that if the work was finished they could be in by 4:00 that day" in order to attend the meeting does not compel an inference of company domination. (See *Culinary Alliance etc. Union* v. *Beasley* (1955), 135 Cal.App.2d 186, 193 [5] [286 P.2d 844].) The testimony that representatives of management walked about and watched the meeting place and "checked" a nearby pool hall "in case that there was any trouble, any violence," does not necessarily indicate the employer's improper support of the formation of the Association; it could also indicate that the employer did anticipate and wished to forestall possible "trouble" or "violence." That "trouble" or "violence" might come from defendants was not an unreasonable fear.

The events after the organizational meeting of January 8 do not compel inferences of management-inspired haste and lack of full and free participation by the employes in the obtaining of the recognition agreement of January 9 and the contract negotiated between the Association and the employer on January 16. There is evidence that employes were anxious to have the pickets removed from the plant. It is also significant that Meader, a person experienced in labor organization problems and not connected with the employer,[9] was engaged by Matthews, consulted with him and other employes, and aided in the conduct of the organizational meeting. (See *Voeltz* v. *Bakers etc. Union* (1953), 40 Cal.2d 382, 386 [2] [254 P.2d 553].) It is to be observed also that the Voeltz case upheld a preliminary injunction under the Jurisdictional Strike Law in a situation similar to the present

[9]Meader had previously done some investigative and photostatic work for plaintiff's attorney in respects not connected with this matter, but they had no contact in connection with the formation of the Association.

one in that the contest for jurisdiction was between an international union, together with its local affiliates, and an independent employes' association which had been formed behind picket lines after the affiliates of the international union had picketed for 11 months in an attempt to enforce their demand for acceptance by plaintiff employer and a commitment by him to compel his employes to join and pay dues to the demanding union.

It thus appears to me that, viewed by rules which are presumed to govern reviewing courts (and which were respected by the District Court of Appeal in its unanimous decision, reported (1959, Cal.App.) 340 P.2d 731, 735-738), the evidence fully supports the trial court's finding that in January, 1958, the drivers then employed by Petri formed a labor organization which was not ''financed in whole or in part, interfered with, dominated or controlled by the employer'' within the meaning of section 1117 of the Labor Code. Such a determination, upon a preliminary injunction, is of course not a determination of the merits of the controversy. (*People* v. *Black's Food Store* (1940), 16 Cal.2d 59, 62 [105 P.2d 361].) Nor is the trial court's denial of the temporary injunction sought by the union a final determination of that aspect of the controversy.

The union's contention that upon the assertedly undisputed facts the trial court should presently grant it affirmative relief by preliminary injunction requiring the employer to recognize and bargain with the union and disestablish the Association is not well taken. The facts of the controversy have not been fully explored. ''The granting of a mandatory injunction pending the trial, and before the rights of the parties in the subject matter which the injunction is designed to affect have been definitively ascertained by the chancellor, is not permitted except in extreme cases where the right thereto is clearly established and it appears that irreparable injury will flow from its refusal.'' (*Hagen* v. *Beth* (1897), 118 Cal. 330, 331 [50 P. 425].)

Upon the evidence before it, the trial court's denial of the preliminary injunction sought by the demanding union may well have been based upon a proper determination that there was no showing that irreparable injury would result from denial of such pendente lite relief. Indeed, a wise discretion would appear to require denial of such relief

at this stage of the proceedings. (*Santa Cruz F. B. Assn.* v. *Grant* (1894), 104 Cal. 306, 308 [37 P. 1034] ; *Lagunitas W. Co.* v. *Marin County W. Co.* (1912), 163 Cal. 332, 336 [125 P. 351].)

This matter should be fully tried upon the merits so that it can be finally determined whether the group of driver employes who formed the Association in January, 1958, did so free of employer interference; whether the group of driver employes whose majority signed union authorizations in the summer of 1957 did so voluntarily; and whether the employer in violation of sections 921 through 923 of the Labor Code discharged union men and refused to continue the employment of drivers who joined the union, or whether the employer's refusal to recognize the union in August, 1957, was permissible refusal to submit to demands which were unlawful under Garmon (1958), *supra,* 49 Cal.2d 595, Chavez (1959), *supra,* 52 Cal.2d 162, and Retail Clerks' Union (1959), *supra,* 52 Cal.2d 222. Until such facts are ascertained I am not prepared to say what right, if any, of the union to affirmative relief may be developed.

However, it is my opinion, speaking generally, that since section 923 of the Labor Code commits the state to a public policy of ''protecting collective bargaining'' (*Chavez* v. *Sargent* (1959), *supra,* 52 Cal.2d 162, 179 [9], 186 [13] ; *In re Porterfield* (1946), *supra,* 28 Cal.2d 91, 119 [29] ; *Shafer* v. *Registered Pharmacists Union* (1940), 16 Cal.2d 379, 385 [3] [106 P.2d 403]), workmen who have freely designated a bargaining representative by voluntary majority selection have legal ''rights of collective bargaining'' which can be protected and enforced by appropriate equitable decree at the suit of such representative (*Chavez* v. *Sargent, supra,* pp. 193, 205-206 [46, 47] ; *Silva* v. *Mercier* (1949), 33 Cal.2d 704, 706 [1], 707 [2] [204 P.2d 609] ; *Elsis* v. *Evans* (1958), 157 Cal.App.2d 399, 409-410 [2, 1b] [321 P.2d 514] ; see *Williams* v. *International etc. of Boilermakers* (1946), 27 Cal.2d 586, 590 [2] [165 P.2d 903]).

The majority say that recognition and enforcement of such right would improperly require the trial court ''to sit as a labor board and thus determine the appropriateness of bargaining units, conduct elections, certify the majority representative, and direct collective bargaining,'' all without specific statutory guidance. But courts are required daily to decide questions in complicated fields in which the particular

judge may not have the particular expertise,[10] and in which the particular rules may not have been developed, which are to be expected, for example, in the case of an administrative board or of a judge who sits for a substantial period of time in a specialized department. Such difficulties (or the difficulties that may result because different trial judges of the same court may have sharply differing views of the law which is applicable to the field; see Horwin, *The Labor Relations Department of the Los Angeles Superior Court* (1942), 31 Cal.L.Rev. 16) are not reason for announcing as a principle of law that rights inevitably flowing from a legislative declaration of policy and general rules cannot be enforced.

Nor does it appear that the lack of definition or explanation by the California Legislature of such matters as what constitutes an appropriate bargaining unit,[11] or who are

[10]The following cases are mentioned merely by way of example: Mandatory injunctions requiring exceedingly complicated acts directed in comparatively simple terms have been affirmed and contempt decrees for their violation upheld. (E.g., *People* v. *City of Los Angeles* (1948), 83 Cal. App.2d 627 [189 P.2d 489]; *City of Vernon* v. *Superior Court* (1952), 38 Cal.2d 509 [241 P.2d 243]; and *City of Culver City* v. *Superior Court* (1952), 38 Cal.2d 535 [241 P.2d 258] [the Hyperion sewage plant cases].) In water rights cases this court has urged the trial courts to devise injunctive physical solutions of complex problems, and has pointed out that a court of equity is not limited by the suggestions of the parties and has broad powers to work out a just solution of the case. (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.* (1935), 3 Cal.2d 489, 574 [54] [45 P.2d 972]; *Rancho Santa Margarita* v. *Vail* (1938), 11 Cal.2d 501, 560 [25] [81 P.2d 533].)

In *Oklahoma* v. *Texas* (1920), 252 U.S. 372 [40 S.Ct. 353, 64 L.Ed. 619]; *id.* (1921), 256 U.S. 607 [41 S.Ct. 540, 65 L.Ed. 1116]; *id.* (1923), 261 U.S. 340 [43 S.Ct. 379, 67 L.Ed. 687]; *id.* (1923), 262 U.S. 505 [43 S.Ct. 701, 67 L.Ed. 1094]; *id.* (1924), 264 U.S. 565 [44 S.Ct. 455, 68 L.Ed. 852]; *id.* (1924), 265 U.S. 76, 490, 493, 500, 505, 513 [44 S.Ct. 457, 68 L.Ed. 908], the United States Supreme Court, through a receiver and commissioners, not only surveyed lands and established boundary lines, but also drilled oil wells (including some dry holes) and produced oil and gas.

In situations such as the foregoing, the courts went about their business of attempting to solve problems by application of the judicial process despite the fact that (it may be assumed) they were without particular expert knowledge in the fields of sewage disposal, protection of water resources, or oil and gas production.

[11]It may be mentioned that Congress did not tell the National Labor Relations Board what constituted an appropriate bargaining unit. Rather, it told the board to decide "whether, in order to insure to employees the fullest freedom in exercising rights guaranteed by this [National Labor Relations Act, as amended] . . ., the unit appropriate for the purpose of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof," and made only three specific provisions in this

employes eligible to vote in an election to select a bargaining representative[12] (see quotation from majority opinion as to this "host of problems," *ante*, pp. 478-479), present insoluble difficulties. In this connection it may be mentioned that the courts of this state dealt for many years with questions of labor relations without statutory guidance as to what constituted a "labor organization" or "union," bona fide or otherwise; they have never had any statutory guidance as to who is a "union organizer," authorized or unauthorized; in the 1930's the term "collective bargaining" appeared in a number of statutes (e.g., in addition to Lab. Code, § 923, in Lab. Code, §§ 222, 224, 554) without any statutory information as to the nature of the process or what constitutes a valid collective bargaining agreement.

Concerning the problem of conducting a representation election, it may be said that where the question of employe representation for collective bargaining purposes is raised in an action by an employer or union (or, as in this case, by cross-actions of both), a California court probably cannot, without some cooperation of at least one of the parties, directly compel them to resort to the auspices of an administrative body constituted for the purpose of conducting or supervising representation elections, for there is in California no such administrative body specifically required to furnish

---

regard; i.e., that the board shall not (1) include professional employes in a unit with nonprofessionals unless a majority of the professionals vote for inclusion; (2) decide that a craft unit is inappropriate on the ground that a different unit has been previously established unless a majority of the employes in the proposed craft unit vote against separate representation; (3) include company guards in a unit which includes other employes. (National Labor Relations Act, § 9(b); 29 U.S.C.A. (1956), § 159(b).)

Naturally, the board has developed expertise as to what bargaining units work most effectively in various situations, but the federal courts, without such expertise, are able to pass upon the correctness of its determinations in this regard. (E.g., *National Labor Relations Board* v. *Hearst Publications* (1944), 322 U.S. 111, 132 [64 S.Ct. 851, 88 L.Ed. 1170]; *Pittsburgh Glass Co.* v. *National Labor Relations Board* (1941), 313 U.S. 146, 156 [61 S.Ct. 908, 85 L.Ed. 1251].)

[12]Congress by its 1959 amendment of section 9(c)(3) of the National Labor Relations Act did not give the board particular statutory guidance in this regard, but merely a wider ambit for determination, by changing the rule that "Employees on strike who are not entitled to reinstatement shall not be eligible to vote," to provide that "Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the [National Labor Relations] Board shall find are consistent with the purposes and provisions of this Act in any election conducted within twelve months after the commencement of the strike." (29 U.S.C.A. (1956, and 1959 Pocket Part), § 159(c)(3).)

such services at the direction of a court. (See *Chavez* v. *Sargent* (1959), *supra,* 52 Cal.2d 162, 215 [56].) But the court can enjoin picketing by a union where it determines that the object of such picketing is to force the employer to recognize the union although such union does not represent a majority of the affected employes (and, if the question arises, that the disaffection of the subject employes for the picketing union is not the result of their participation in a company-dominated union). (Lab. Code, §§ 923, 1116-1118.) Or the court can enjoin the employer from recognizing and maintaining a company union if it determines that a majority of his employes would prefer representation by the picketing union but adhere to the company union for fear of reprisal. (Lab. Code, §§ 1116, 1117, 1122.) Parties to a labor dispute faced with recognition of these injunctive powers of the court would undoubtedly be more willing to cooperate in working out or accepting a plan for a fair election (see *Chavez* v. *Sargent, supra,* pp. 215-216 of 52 Cal.2d, footnote 16), by reference if necessary, or to accept the services of the State Conciliation Service, a state agency which itself has no enforcement powers and no specifically enjoined duty to conduct representation elections (except in limited situations not at this time applicable to private employers), but which has facilities for and expertise in conducting representation elections where the parties agree thereto and the number of affected employes is not too great.[13]

---

[13]The State Conciliation Service was created by the director of the Department of Industrial Relations under section 65 of the Labor Code. That section now provides (Stats. 1949, ch. 568, p. 1058) that the department ''may investigate and mediate labor disputes providing any bona fide party to such dispute requests intervention by the department and the department may proffer its services to both parties when work stoppage is threatened and neither party requests intervention. In the interest of preventing labor disputes the department shall endeavor to promote sound union-employer relationships. The department may arbitrate or arrange for the selection of boards of arbitration on such terms as all of the bona fide parties to such dispute may agree upon. . . .''

As originally enacted (Stats. 1939, ch. 810, p. 2368) section 65 provided for department intervention only when ''all bona fide parties to such dispute join in a request for intervention.'' Concerning such voluntary mediation tribunals it was said by Messrs. Mathew O. Tobriner (now Associate Justice of the District Court of Appeal, First District, Division One) and Richard S. Goldsmith (then both of the San Francisco Bar) in *''Cooling-Off'' and Mediation Statutes in the States* (1947), 20 So.Cal.L.Rev. 264, 272-273, ''These tribunals are the sole agencies for maintaining industrial peace and safeguarding the rights of labor, and are not complemented by labor relations acts which are articulated

In the present case it seems to me, without suggesting what the trier of fact should find upon the evidence which may develop, that it might find that the driver employes, whether or not they constitute the sole possible appropriate bargaining unit, do constitute *an* appropriate bargaining

---

by enforcement agencies. To this extent they are seriously handicapped, regardless of their formal structure or their prescribed procedure."

In its present form section 65 can be given more comprehensive application than in its original form; in 1951 (18 Ops. Cal.Atty.Gen. 216, 218) the attorney general expressed the view that the conciliation service *must* investigate and mediate labor disputes when a bona fide party requests intervention, and has discretion to offer its services when no party requests intervention. The conciliation service itself is of the view that "Collective bargaining has prospered in California under this principle [of "voluntarism" adopted in section 65]" (1958 Annual Report of State Conciliation Service, p. 7); however, the conciliation service has also referred to developments of "compulsion and the exercise of authority through government" in the labor laws of other states and in federal legislation, and predicts that "changes ahead may further shrink the area of voluntarism and self-government" (*id.*, p. 13).

An example of such "compulsion" is the legislative invocation of the conciliation service by the Los Angeles Metropolitan Transit Authority Act (Stats. 1957, ch. 547, amended Stats. 1959, ch. 519). (See (1958) 32 Ops. Cal.Atty.Gen. 25; 1958 Annual Report of State Conciliation Service, pp. 7, 16-17.) The act (§ 3.6(c)) (in accord with the policy declared in Lab. Code, § 923, and related sections, as construed and upheld in *Chavez* v. *Sargent*) recognizes that "Employees [of the transit authority] shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." It *requires* submission to the conciliation service of any "question whether a labor organization represents a majority of employees or whether the proposed unit is or is not appropriate" (§ 3.6(d)). Under this legislation the conciliation service has authoritatively conducted elections and certified bargaining representatives for the transit authority employes.

Also compulsory collective bargaining, and authoritative designation of bargaining units, conduct of representation elections, and certification by the conciliation service for transit district employes are provided for by the Public Utilities Code (§§ 25051, 25052, Stats. 1955, ch. 1036).

Although the conduct of representation elections is not mentioned in section 65 of the Labor Code, this "common procedure in collective bargaining . . . is applied by the Conciliation Service" to solve representation questions in private industry. (1951 Annual Report of State Conciliation Service, p. 9.) "The supervision of employee elections by the State Conciliation Service is by voluntary agreement of all parties in collective bargaining relationships, actual or potential. . . . The parties must agree in advance that they will accept and will abide by the results of the election." (1958 *id.*, p. 14; 1957 *id.*, p. 11.) The use of the offices of the conciliation service to conduct elections in representation disputes "implements the policy which is written into the State Labor Code [§ 923], namely '. . . that the individual workman [shall] have full freedom of association, self-organization, and designation of representatives of his own choosing . . .' " (1956 *id.*, p. 20.) Therefore, judicial enforcement of an agreement between an employer and a union

unit, and that it could determine (by reference, if necessary) whether the union, the Association, or neither is the bargaining representative of a majority of that group as to the time of the institution of this litigation.

This dissent, of course, is not intended to constitute a criticism of my brothers who comprise today's majority; I respect them highly. It is, however, an effort to show that their views on the subject issues are unjustified by law and undesirable in philosophy, and possibly to assist some future differently constituted majority, or the Legislature, or the people by initiative, to take steps that will lead us permanently away from the ungoverned procedures, the uncivilized actions, all too often including brutal assaults, and the inevitably wasteful results which are inherent in the "free interaction of economic forces" espoused by today's majority.

For the reasons above stated, I would affirm the order granting plaintiff a temporary injunction and denying defendant's application for a temporary injunction.

Spence, J., and McComb, J., concurred.

Respondent's petition for a rehearing was denied February 24, 1960. Schauer, J., Spence, J., and McComb, J., were of the opinion that the petition should be granted.

---

for a representation election under the auspices of the conciliation service, was decreed in *California Hotel* v. *Culinary Workers*, San Bernardino County Superior Court No. 87141 (1956 *id.*, pp. 37-38). (In *Griffin* v. *Lima* (1954), 124 Cal.App.2d 697, 698, 701 [269 P.2d 191], the complaint of the union alleged that such an election was held under an agreement by which defendant employers undertook to recognize and bargain with the union if a majority of the employes designated it as their bargaining representative, but after a majority of the employes voted to be represented by the union the employers refused to bargain. The trial court made its minute order providing that "[T]he Union having admittedly won the election, the defendants should now be required to negotiate. A temporary injunction will therefore issue as prayed for in the complaint." Defendants' appeal from this minute order was dismissed because it was not a final appealable order. The question whether the agreement could be specifically enforced (e.g., by mandatory injunction requiring defendants to bargain) was left open.)

It may be mentioned also that, although supervision of a representation election by the conciliation service "is not a substitute for any legal obligation which may adhere to any party through State or Federal law," the N.L.R.B. recognizes the accuracy of the results of such elections and accords them the same status as elections conducted by the federal board. (1958 Annual Report of State Conciliation Service, p. 14.)